(75 South. 238)

No. 22318.

CITY OF NEW ORLEANS v. TOCA.

(March 12, 1917. Rehearing Denied May 14, 1917.)

*(Syllabus by Editorial Staff.)*

1. CONSTITUTIONAL LAW ⬦296(1)—DUE PROCESS OF LAW—"LIBERTY."

The "liberty" guaranteed by Const. art. 2, providing that no person shall be deprived of life, liberty, or property without due process of law, includes the right to manufacture and offer for sale any article of commerce one pleases so long as the doing so does not come under the restrictive jurisdiction of the police power.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 825–827.

For other definitions, see Words and Phrases, First and Second Series, Liberty.]

2. CONSTITUTIONAL LAW ⬦70(1) — POLICE POWER—LEGISLATIVE AND JUDICIAL FUNCTIONS.

Whether there is danger of the public buying food injurious to health or different from that intended to be bought so as to authorize the exercise of the police power, and whether such danger sufficiently affects the public interests to justify the intervention of the government, is a question for the legislative department, but the legislative action is subject to revision by the courts.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 129, 132, 137.]

3. CONSTITUTIONAL LAW ⬦48 — MUNICIPAL CORPORATIONS ⬦122(2) — ORDINANCES AND STATUTES—PRESUMPTION OF VALIDITY.

There is a presumption of validity in favor of a statute or ordinance; but such presumption, however strong, is not conclusive, though the legislative action will be sustained if possible under any reasonably supposable state of facts.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 46; Statutes, Cent. Dig. § 56; Municipal Corporations, Cent. Dig. §§ 284–286.]

4. FOOD ⬦1—VALIDITY OF REGULATIONS.

A municipal ordinance requiring ice cream to contain at least 10 per cent. of butter fat, and providing that any frozen product, with certain exceptions, containing milk or cream, whether designated as custard, etc., or by whatever name it is designated, shall be deemed ice cream, is invalid as applied to a frozen product offered for sale only as custard, and which is pure and wholesome, though not containing the required percentage of butter fat.

[Ed. Note.—For other cases, see Food, Cent. Dig. §§ 1, 2.]

Sommerville, J., dissenting.

Appeal from Recorder's Court of New Orleans; Louis Burthe, Jr., Recorder.

Albert Toca was convicted of violating a municipal ordinance, and he appeals. Judgment set aside, and accused discharged.

Albert Guilbault, of New Orleans, for appellant. I. D. Moore and W. L. Hughes, both of New Orleans, for appellee.

PROVOSTY, J. The accused, Albert Toca, is charged with having violated the "ice cream" ordinance of the city of New Orleans by selling a frozen compound which he sells under the name of "Toca's Custard."

For 15 years previous to this prosecution he had been manufacturing this product and selling it both directly from factory to consumer and through peddlers on the street; but lately there was added to the "ice cream" ordinance of the city the following:

"Provided that any frozen product, except fruit ice cream, nut ice cream, frozen cream cheese, and frozen buttermilk, which shall contain milk, whole or skimmed, or cream, whether the same shall be designated as 'custard,' 'frozen custard,' 'frozen dainties,' or by whatever name such frozen product is designated, shall, for the purpose of this ordinance, be deemed to be 'ice cream,' and shall be made to conform to the requirements provided in this ordinance for 'ice cream.' "

As ice cream must under the ordinance contain at least 10 per cent. of butter fat, the effect of this proviso which classifies custard as ice cream is to require Toca's Custard to contain that proportion of butter fat.

Its ingredients are rice, barley, hominy, sugar, eggs, milk, and flavoring; and it is made after a recipe for which the accused has obtained a patent from the United States government. Its characteristic features, both of which are accentuated in the patent, are its inexpensiveness and digestibility. Both of these would be destroyed by the addition of this quantity of fat—practically, the product would become a different one; hence the ordinance has the effect of suppressing the business.

"Permission to sell, when accompanied by the imposition of a condition which, if complied with, will effectually prevent any sale, amounts in law to a prohibition." Collins v. New Hampshire, 171 U. S. 30, 18 Sup. Ct. 768, 43 L. Ed. 60.

[1] Accused contends that the ordinance is null, as depriving him of the "liberty" which is guaranteed to him by article 2 of the Constitution, reading:

"No person shall be deprived of life, liberty or property, except by due process of law."

The liberty here guaranteed includes the right to manufacture and offer for sale any article of commerce one pleases, so long as the doing so does not come under the restrictive jurisdiction of the police power.

[2] This jurisdiction, in so far as bearing upon the sale of an article of human food, is based upon the right, or duty, of the government to protect the public against being subjected to the danger of buying food injurious to health or different from that which is intended to be bought.

The question of whether this danger exists in any particular case, and sufficiently affects the public interest to justify the intervention of the government, is one for the legislative department of the government. But the legislative action is subject to revision by the courts when complaint is made; for the Constitution is the paramount law, and it would be such in name only if when transgressed authority did not reside somewhere for vindicating its supremacy; and this authority resides ex necessitate in the courts.

[3] A statute or ordinance is not to be supposed to have been adopted without due deliberation; that is to say, without a full knowledge of all the facts and a careful weighing of the public interest on the one hand and private rights on the other. This gives rise to a presumption of validity in favor of the legislative action; and the strength of this presumption is added to in practice by the respect which one of the departments of the government naturally entertains for the decisions of any one of the other departments. But this presumption, however strong, is not conclusive, as one might be led to suppose from the enunciation of it found in many decisions. The contrary is attested by a large number of other decisions whose correctness is now questioned by no one. It, in last analysis, amounts simply to this, that

the legislative action will be sustained if the doing so is possible under any reasonably supposable state of facts.

[4] What reasonably supposable state of facts, then, could justify the fixing of this butter fat standard for custard?

The consideration of danger to the public health may be eliminated at once. For the requirement of a certain proportion of butter fat does not make for greater purity or wholesomeness, but only greater richness or nutritiousness.

The sole consideration must be that of possible deception of the public; of the people being misled into buying a custard different from that which they think they are buying. On the point of whether or not the people of New Orleans have formed the notion, or become imbued with the idea, that custard is deficient in butter fat unless measuring in that respect up to a certain standard, there is no evidence in the record. There is evidence going to show that in New Orleans, as elsewhere, most of what is sold as ice cream is in reality frozen custard; but the effect of that evidence is merely to show that ice cream may in New Orleans be properly classed as ice cream; not that in New Orleans custard as such, not as ice cream, is understood to measure up to a certain standard in butter fat, so that those who buy it, as such, not as ice cream, will be misled unless it does so measure.

No doubt such a state of mind as this is possible or supposable; but it is equally possible or supposable, with respect to the other nutritious elements of custard—the sugar and the egg—so that if a standard of nutritiousness may be prescribed for the butter fat element, so may it, for like reason, be prescribed for the sugar and the egg elements. And if the elements of custard may be thus dictated, why not those of every other manufactured article of human food? And if those of articles of human food, why not those of every manufactured article of commerce, for the public is as liable to form notions with regard to the constituents of one manufactured article as of another, and the manufacturer is no more privileged to deceive the public in the matter of one article than of another?

The situation would therefore seem to be that this butter fat standard, which destroys the business of accused, cannot be maintained, unless the right is to be recognized in the public authorities to fix in like manner a destructive standard for every manufactured article of commerce; an idea which, needless to say, cannot be entertained for a single moment.

We are aware that the courts have gone so far as to sanction the legislating of oleomargarine (an admittedly wholesome article of food) from the market. State v. Addington, 77 Mo. 110; Powell v. Commonwealth, 114 Pa. 265, 7 Atl. 913, 60 Am. Rep. 350; Powell v. Pennsylvania, 127 U. S. 678, 8 Sup. Ct. 992, 1257, 32 L. Ed. 253. But these decisions, and others along the same line, will, we imagine, hardly now be followed in the broadness of their doctrine. While refusing a writ of error from this Addington decision Mr. Justice Miller expressed the opinion that the decision was in violation of the Constitution of Missouri. In re Brosnahan (C. C.) 18 Fed. 62. Though he concurred in the Powell decision. Mr. Justice Field, however, dissented from the Powell decision, and Judge Dillon in Mun. Corp. par. 141, had this to say decision:

"We cannot but express our regret that the Constitution of any of the states, or that of the United States, admits of a construction that it is competent for a state Legislature to suppress (instead of regulating) under fine and imprisonment the business of manufacturing and selling a harmless, and even wholesome, article, if the Legislature chooses to affirm, contrary to the fact, that the public health or public policy requires such suppression. The record of the conviction of Powell for selling without any deception a healthful and nutritious article of food makes one's blood tingle."

The more conservative doctrine is that of People v. Marx, 99 N. Y. 377, 2 N. E. 29, 52 Am. Rep. 34, where the prohibition of the sale of oleomargarine was held to be unconstitutional, and People v. Biesecker, 169 N. Y. 53, 61 N. E. 990, 57 L. R. A. 178, 88 Am. St. Rep. 534, where the same view was taken of a statute prohibiting the use of preservatives, however harmless.

Cases where known articles of commerce, such as linseed oil, vinegar, etc., have not been allowed to be sold in an adulterated state even though offered for sale under names indicative of the adulteration are, of course, not in point. There the known virtues or properties of the articles in their unadulterated state were sought to be made to serve as inducements for the purchase of the adulterated articles.

Nor are the cases of natural products upon which the people are in the habit of relying largely for their nourishments, such as milk and butter, in point. Custard, sold as such, not as ice cream, cannot reasonably be said to be relied upon largely by the people for their nourishment; no more so than a thousand other articles of commerce upon which, we assume, the Legislature would not think of laying a hand.

A butter fat standard for ice cream has been sustained in two cases, which have been affirmed by the Supreme Court of the United States. Com. v. Crowl, 245 Pa. 554, 91 Atl. 922; State v. Hutchinson Cream Co., 168 Iowa, 1, 147 N. W. 195; same cases, 242 U. S. 153, 37 Sup. Ct. 28, 61 L. Ed. 217.

In the Crowl Case the Supreme Court of Pennsylvania said:

"That ice cream is in general use is admitted; that it is largely composed of milk and cream is shown by the evidence in the case. Its name implies the use of cream in its composition, and all of the authorities to which the learned counsel for the appellant refer show that milk and cream are constituents in its composition. It enters so largely into the food supply of the public as to have become a proper subject of legislation, especially in view of the opportunities which its manufacture affords to practice imposition. In the popular understanding it is largely composed of milk of which butter fat is an important constituent. If by the exercise of ingenuity and by the practice of unwarranted thrift a product can be put on the market having the name and appearance of ice cream, but lacking the chief element which gives it value as an article of food, a large opportunity would be afforded to dealers in that article to profit by deception, and it is the opportunity for such deceit of which the police power takes notice and seeks to take away."

Here the two facts, that the word "cream" carries with it a certain implication of butter fat richness by which the public might be misled, and that "ice cream" enters largely into the food supply of the public, are stressed.

In the Hutchinson Case the Supreme Court of Iowa said:

"It is said by defendants that they are deprived of the right to sell their product if it contains a less per cent. of butter fat than that prescribed by the statute, and that the sale of such is entirely prohibited. This, we think, is an assumption not warranted. They may sell it for what it really is."

Thus showing that it was the deceptive feature of the article as implying a certain standard of purity or nutritiousness that was the real basis of the decision.

In reviewing these cases the Supreme Court of the United States said:

"It is specially urged that the statutes are unconstitutional because they do not merely define the term 'ice cream,' but arbitrarily prohibit the sale of a large variety of wholesome compounds theretofore included under the name 'ice cream.' The acts appear to us merely to prohibit the sale of such compounds as ice cream. Such is the construction given to the act by the Supreme Court of Iowa. State v. Hutchinson Ice Cream Co., 168 Iowa, 1, 15, 147 N. W. 195, which is, of course, binding on us. We cannot assume, in the absence of a definite and authoritative ruling, that the Supreme Court of Pennsylvania would construe the law of that state otherwise. The conviction here under review was for selling the 'compound' as ice cream, so that we are not called upon to determine whether the state may, in the exercise of its police power, prohibit the sale even of a wholesome product, if the public welfare appear to require such action, and if, as here, interstate commerce is not involved."

We fail entirely to find wherein the public welfare can require the establishment of any such standard for custard, whether frozen or on pie crust, any more than for any other article of food; and as we are not prepared to say that a standard of nutritiousness may be set for all articles of food offered for sale, we find ourselves constrained to hold that one cannot be set for custard.

In Rigbers v. Atlanta, 7 Ga. App. 411, 66 S. E. 991, the Court of Appeals of Georgia said of ice cream that it "is a luxury, rather than a necessity," and refused to allow a butter fat standard to be set for it under the general welfare clause.

But conceding that for ice cream, the use of which as an article of diet has come to be so widespread, a standard may be set, the same thing cannot be said of custard, which in its frozen state is not commonly offered for sale to the public as custard; and it is as custard, distinctly as such, that accused offers his product to the public. The eupeptic man may want his custard rich in fat, and correspondingly indigestible; the dispeptic may want his more of the kind that Toca offers. It is not for the law to step in and say to the latter, you shall not be allowed to buy and eat the light and digestible kind, but only the fat and indigestible.

The case is not that of there being nothing in a name, of a rose by any other name smelling as sweet; the question being one of deception vel non, there is everything in the name. The mixtures which were forbidden to be offered for sale as linseed oil and as vinegar, for instance, would never have been forbidden to be offered for sale under other names. There would have been no room for deception, and therefore no basis for constitutional repression. The cases in which the outlawing of oleomargarine offered for sale as such with no attempt at deception has been sanctioned stand, we must admit, more or less in the way; but those decisions must be admitted to have reached the very extreme limit, and to be justifiable only on the score of the peculiar resemblance of oleomargarine, a manufactured article, to butter, a natural product and one of the main articles of human food, and on the peculiar opportunities that the sale of oleomargarine offers for deception. And also may not such a thing be as that the strong popular prejudice existing at first against this supposedly fake butter had found some unconscious lodgment in the judicial mind, and furnished the last feather in the scale?

The judgment appealed from is therefore set aside, and the accused is ordered to be discharged without day.

SOMMERVILLE, J., dissents.