174 So. 609

# GILCHRIST DRUG CO. v. CITY OF BIR-MINGHAM et al.

## 6 Div. 71.

Supreme Court of Alabama.

April 22, 1937.

Rehearing Denied May 27, 1937.

Horace C. Wilkinson, of Birmingham, for appellant.

W. J. Wynn and Mullins, Deramus & Stuart, all of Birmingham, for appellees.

GARDNER, Justice.

Complainant, within the police jurisdiction of the City of Birmingham, is operating a drug store in which is made and sold to the public ice cream manufactured by what is known as the "counter freezer" method, and seeks in this proceeding injunctive relief against the enforcement of an ordinance of the City of Birmingham, requiring its manufacture by a different process referred to as the "pasteurized continuous flow method," as found in the City Code, as follows: "Sect. 5249. (g). All ingredients used in the manufacture of ice cream or other frozen substances, composed in whole or in part of milk or milk products, shall be pasteurized as provided herein, and shall flow or be conveyed through appropriate pipes or conveyors from the pasteurizing apparatus directly into the freezing apparatus, and from that directly into a sterile can, carton or other final container, in such manner as to protect the same against contamination."

By another provision of the ordinance, ice cream manufactured by any other method is condemned as unsanitary and the manufacture and sale prohibited.

Upon submission for final decree on pleadings and proof, heard orally in open court, the chancellor denied injunctive relief, and dismissed the bill, and from the decree rendered complainant prosecutes this appeal.

The counter freezer method for the manufacture of ice cream is a modern invention, and was introduced into this state four or five years ago. Quite a number have been sold and put into operation in different cities in the state, but the ordinance here in question challenges complainant's right to manufacture ice cream in that vicinity by this method, and hence the litigation.

It may be said, however, at the outset, that the adoption of this ordinance was before the counter freezer method was introduced, and bore no relation thereto. It was inspired by the typhoid fever epidemic of 1916, and the result of an investigation conducted by Dr. Lumsden, Medical Director of the United States Public Health Service, who testified in this case, and who came to Birmingham in 1916, at the request of local and state authorities, to make a study of the typhoid outbreak. He concluded, after completing his studies of the situation, that the outbreak was caused by infection in a supply of ice cream distribut-ed in the city by one wholesale plant, and, as a result, he recommended the enactment of this particular ordinance.

The ordinance, as will be observed, requires that the mix be pasteurized and flow or be conveyed through appropriate pipes or conveyors from the pasteurizing apparatus directly into the freezing apparatus, and from that directly into a sterile can, carton, or other final container, the purpose of such flow being, of course, to reduce to a minimum the handling of the product by the human hands, and thus avoid any question of contamination as much as may be possible or practicable.

The manufacturing plants in Birmingham, it seems, now conform to these requirements, and have the pasteurizing apparatus so connected as to give the continuous flow specified in the ordinance.

The counter freezer operated by complainant has no such arrangement for continuous flow, though the mix it uses is pasteurized, as required by the ordinance. This mix, however, is not pasteurized on the premises, but is shipped to complainant from a point in Kentucky in a ten-gallon sealed can, with parchment paper between the mix and the sealed lid. When it reaches complainant, the mix is poured into cans, which hold five quarts each, and these cans are stored in the storage cabinet of the freezer which is kept at a temperature of thirty-five degrees. From these cans the mix is poured into the counter freezer as needed, the freezers usually being of a capacity of two and one-half and five gallons. Thereafter the operation is practically as that of the other method; though the city insists that in the matter of cleansing the parts, particularly the dasher of the counter freezer, the advantage is with the continuous flow method so far as the matter of contamination is concerned.

Clear enough from the proof, the more the handling of the mix and the freezer parts the greater the hazard of contamination and infection. And undisputedly ice cream, being a milk product, is peculiarly susceptible to contamination and infection. Dr. Lumsden says: "Milk and milk products come in contact with a human being who is infected, either conveying the disease or being a carrier of infection without having the disease or infection at the time, and coming in contact with milk. Milk is a favorable bacterial culture medium."

Numerous adjudicated cases sustaining legislative regulations concerning this sub-

ject are found cited in the note to Cofman v. Ousterhous, 18 A.L.R. 219, and fully support this view. See, also, Pfeffer v. Milwaukee, 171 Wis. 514, 177 N.W. 850, 10 A.L.R. 128, and note.

Dr. Burke, of the Dairy Science Department of the Alabama Polytechnic Institute, stated the advantages of the counter flow method in this succinct statement: "The direct flow method prevents, in so far as we know, in a practical way, contamination of the mix from the point of processing to freezing. * * * It is the best way. The only feasible way that we know." The continuous flow, says Dr. Burke, is a safer method, and with the hazard of the counter freezer method "there is all the possibility of contamination as a result of dipping the mix, or pouring the mix from one container to another or separating the mix into two batches prior to freezing, two or more batches,—there is always the possibility of contamination directly by the handlers."

Detail testimony as to the handling of the mix, by whom and in what manner, as well as the cleaning of any parts, may well be omitted as unnecessary to relate.

In the matter of inspection also the proof is to the effect the continuous flow method has the advantage. It is not, as argued, a mere matter of convenience, but the proof is that in so large a population, from a practical standpoint, the continuous flow method is the only feasible one for efficient inspection, and that the counter freezer method opens a wide door for deception or oversight.

C. A. Abele is director of inspection of our State Health Department, with much study and experience in public health for more than twenty years. His duties carry him over the entire state, and he is familiar with, and has inspected, numerous counter freezers, and is likewise familiar with the continuous flow method. In his testimony, the reasons are given for so decided a preference for the continuous flow method from a standpoint of preservation of public health. One of these reasons was not alluded to by other witnesses. The mix, he says, used in this state is shipped here from other states, and a laboratory study has been made as to the condition of the mix as it reaches the counter freezer: the temperature which will best maintain bacterial growth at a minimum is fifty degrees or less. Above that temperature it grows more rapidly. "Some of the mix was found to reach the distributing point at seventy-six degrees. A freezing of mix which has bacteria count as a result of that high temperature can never lower the count. It is there: freezing is not going to change it." Laboratory tests concerning ice cream as to bacterial counts, he testified, have shown, as to counter freezers, a count five times as great as that from the continuous flow manufacture. Of course, as elicited on cross-examination, this count includes harmless as well as harmful bacteria, with no knowledge of the proportion of either. An additional difficulty in the manufacture of counter freezer ice cream, as observed by Mr. Abele in his inspections, was that the work is usually conducted by persons who have no conception of the care necessary in a food product of that nature.

Dr. Smith, assistant epidemiologist for the State Health Department, testifies to his familiarity with both methods of the manufacture of ice cream herein discussed, and that the advantage from a public health standpoint is with the continuous flow method, and gives his reasons therefor.

Dr. McLester of Birmingham, immediate past president of the American Medical Association, adds his opinion to that of the others in favor of the continuous flow method, and opposed to that of the counter freezer; and as director of the Department of Child Health in the city schools, does not permit its use there.

J. M. Lesure is director of the Bureau of Milk Control of the City Health Department of Baltimore, Md., a graduate of the University of Maryland, and with long public health experience. He is familiar with both methods. Asked as to whether or not there was less hazard with the continuous flow method, replied: "I don't think there is any question." It is interesting to note that though the ordinance in the city of Baltimore does not specifically require the continuous flow method, yet it appears from his testimony the health authorities have been successful in enforcing the same in actual practice, and the pasteurizing process is accomplished on the premises.

Dr. Enneis is city health officer of Knoxville, Tenn., where the city ordinance is practically a duplicate of that here attacked, and he adds his decided opinion in favor of the continuous flow method from a public health standpoint.

Dr. Fabian, associate professor of Bacteriology and Hygiene of Michigan State College, is familiar with both methods, and his opinion also is "that the direct flow method is the safer method of the two." On

the question of pasteurization, the witness admitted there was not a complete absence of bacteria after pasteurization, but that the percentage of efficiency varies from 95 to 99 per cent.

Dr. J. D. Dowling, health officer of Jefferson County for twenty years, testified: "My opinion is that the direct flow is the only safe method and the only means of excluding in ordinary practice contamination by human hands." He adds that this method also affords better opportunity for inspection.

The testimony offered by the city shows that the plants with direct flow method have meters by which on inspection the temperature can be ascertained at any given time.

Complainant's argument appears to assume the ordinance is a prohibitory one, but such is not the case. It is a regulation, and not a prohibition. Like argument was advanced in Mannix v. Frost, 100 Misc. 36, 164 N.Y.S. 1050, 1056, against an order of the board of health of the city of Albany prohibiting milk dealers from selling loose or dipped milk in the city, as had been the custom, so plaintiff insisted, for fifty years. The court replied that the "regulation does not prohibit the sale of milk; it only regulates the manner in which it shall be distributed. The effort is entirely in keeping with the serious and intelligent effort which is being made in every direction to protect and guard the lives and health of the people in the congested centers of population. * * * The question is, not how long it has been done, but whether in the doing of it there is a danger or risk which can be avoided, by which the milk thus exposed in the streets of a city may become contaminated."

So in the instant case regulation is all that is involved, and there is rather persuasive proof that counter freezers may well be equipped with an apparatus attached thereto for pasteurization, which has been proven as effective as those now in operation in the larger plants. Such is the testimony of J. M. Lesure, director of the Bureau of Milk Control in Baltimore, who states that ten-gallon pasteurizing outfits are on the market, and quite a few of them are in actual operation now in that city. An excerpt from his testimony may prove of interest: "Yes, we have quite a few of them in operation at the present time with counter freezer of ten gallon capacity. That is the best equipment which we helped to design with the local manufacturer of dairy equipment and it serves three purposes. It acts as the pasteurizer in connection with an ordinary gas heater unit which is used in the home for means of heating, eliminating expense of a great big steam boiler. It is equipped with refrigeration coils for the cooling of the mix after pasteurization and in addition to that, third, there is a storage tank for the mix in case people desire to see the mix prior to freezing." "2. That can be bought generally? A. Oh yes, that is for sale all over the country and all over the world I imagine."

Complainant elicited from the witnesses for the city an admission that they knew of no epidemic attributable to the counter freezer or case of typhoid fever that could be so traced; and much stress is laid in brief upon such admission. But we think complainant overestimates the importance of such negative proof.

Perhaps, also, in Mannix v. Frost, supra, the city in requiring milk dealers to cover or inclose the milk was likewise unable to trace any particular illness to that source. But, observed the court, "the 'police power' of a city means a power to prevent, an anticipation of danger to come, an active and earnest interest to protect the people, and in so doing to curb and restrain the individual tendency." The Mannix Case was decided twenty years ago, and the requirement that the milk sold to the public in centers of large population should be protected from exposure was vigorously contested; and yet there would be few today bold enough to question the wisdom of such a precautionary measure.

Rapid advance has been made in the science of medicine and in the field of bacteriology. That the health and welfare of the people have been greatly advanced by the conscientious and intelligent labor of the scientists and members of the medical profession cannot now be open to question. Their labors are not to be restricted to curing disease and alleviating suffering, however important these may be, but the greater benefits are to be realized by the use of preventive means in anticipation of the danger of an epidemic. And it is fully as important that the health authorities should anticipate danger to public health, and provide against them, as it is to take steps to eradicate conditions after the disease has appeared.

An array of experts have unqualifiedly indorsed the continuous flow method, and have given their reasons for condemning the counter freezer method, now in use by complainant. No one can doubt their high standing in their chosen field, nor their sincerity of purpose, and lack of any selfish motive.

As opposed, complainant offers three witnesses. The first, J. G. Keebler, a graduate in 1931 of Dairy Manufacturing, University of Illinois, and who for five years has been director of ice cream research for the manufacturer of counter freezers, whose livelihood comes from the business interfered with by this ordinance. But he admits that a "dangerous source" of contamination is the handling by human beings, and as having a bearing on the continuous flow method the witness, in answering as to the methods followed in Birmingham, as observed by him, used the following expression: "I find that the safest processing of the mix is a matter of mixing the ingredients in a pasteurizing vat and pasteurizing at the required temperature, flowing from there into the vasculizer. The particular plant that I inspected, instead of using the surface cooler, runs the pasteurized mix into a cooling vat." The next witness for complainant was D. T. Macon. He sold this particular freezer to complainant, and identified as correct a list of those in the state using freezers of this character. That is the extent of his evidence. The last witness is M. E. Gilchrist, the president of complainant corporation, and the operator of the drug store. Mr. Gilchrist is completely convinced that the counter freezer is entirely satisfactory in every way, that it makes better ice cream, and at less cost. He is evidently a very careful and painstaking druggist, and operates the counter freezer in as sanitary manner as may be practically done. But from the standpoint of the city's experts, he could not, of course, eliminate all of the risks incident to the handling of the mix or cleaning the parts of the freezer. The prudent manner, however, in which Gilchrist may conduct the business is not the test.

As observed by the Wisconsin Supreme Court in City of Milwaukee v. Childs Co., 195 Wis. 148, 217 N.W. 703, 705: "Because milk is customarily handled in a manner which affords opportunity for contamination, the municipality is justified in prescribing regulations for the handling of milk in a manner which shall avoid opportunity for such contamination. Such regulations when so prescribed must be observed by those dealing in milk. The dealer cannot justify noncompliance with such regulations by asserting that his method of handling milk was just as sanitary as the regulations prescribed by the municipality. It is possible that, if all dealers handled milk as defendant did, there would be no necessity for the ordinance. But the fact that many dealers do not observe sanitary methods in handling milk makes such regulations necessary or proper. When such regulations are prescribed, they must be observed by all, by the considerate as well as by the inconsiderate dealer."

We are not unmindful that complainant elicited proof there was also possibility of contamination even as to the continuous flow method, and that the machinery and pipes used must likewise be cleansed and to some extent exposed and handled by employees.

Like argument was doubtless advanced in Barrett v. Rietta, 207 Ala. 651, 93 So. 636, where an order for screening and protecting fruit and food from contamination by flies and insects was assailed, and the court replied that perfection of preservation was not required or to be expected.

True, precautions required to be observed by such ordinances may still leave much to be desired, but they point the way to a health goal, and are movements in the direction of public welfare. There are, of course, limits beyond which such regulatory measures may not go, and due consideration has been given complainant's argument that this ordinance infringes upon its constitutional right to engage in a lawful business, because unreasonable and arbitrary, and is but a spoliation of private business under the guise of promoting public health. But after all this insistence is based upon the assumption that "potential danger to health or safety is not sufficient," to use the language of its brief, to justify such an ordinance. But the purpose of such regulations is to forestall and prevent sickness and disease, and actual proof that disease has been traced to such a source has not been considered an essential condition precedent to the adoption of reasonable and appropriate rules to guard against the probability of infection.

It was potential danger to health that inspired the ordinance as to protection of

food from contamination by flies, upheld in Barrett v. Rietta, supra, and that requiring milk dealers to inclose the containers as they sold to the public, considered in Mannix v. Frost, supra, where appears the appropriate expression that the "'police power' of a city means a power to prevent, an anticipation of danger to come, an active and earnest interest to protect the people."

The City of Birmingham by express statutory direction (Gen.Acts 1915, p. 296) is given full, complete, and unlimited police powers possessed by the state, and the power of the city to enact ordinances for the protection of the public health is, of course, here unquestioned. Mitchell v. City of Birmingham, 222 Ala. 389, 133 So. 13; Ex parte Byrd, 84 Ala. 17, 4 So. 397, 5 Am.St.Rep. 328; Town of Greensboro v. Ehrenreich, 80 Ala. 579, 2 So. 725, 60 Am.Rep. 130; Barrett v. Rietta, 207 Ala. 650, 93 So. 636; Spear v. Ward, 199 Ala. 105, 74 So. 27.

Complainant attacks the ordinance as unreasonable and arbitrary, and that its requirements go far beyond any reasonable necessity for protection to the public, and as a consequence its enforcement infringes upon its constitutional rights, both state and federal.

While the courts are slow to interfere with the wide discretion vested in the municipal authorities in enacting ordinances for the public welfare, yet the duty rests upon the courts to determine their reasonableness, and if found to be unreasonable, and but arbitrary fiats, do not hesitate to perform that duty and strike them down.

Complainant has noted many illustrative cases where the ordinances and statutes were declared invalid, which we have carefully considered, among them: Town of Greensboro v. Ehrenreich, 80 Ala. 579, 2 So. 725, 60 Am.Rep. 130; Weaver v. Palmer Bros. Co., 270 U.S. 402, 46 S.Ct. 320, 70 L.Ed. 654; Schollenberger v. Pennsylvania, 171 U.S. 1, 18 S.Ct. 757, 43 L.Ed. 49; People v. Weiner, 271 Ill. 74, 110 N.E. 870, L.R.A.1917C, 775; Frost v. City of Los Angeles, 181 Cal. 22, 183 P. 343, 6 A.L.R. 468; Marymont v. Nevada State Banking Board, 33 Nev. 333, 111 P. 295, 32 L.R.A.(N.S.) 477, Ann.Cas.1914A, 162; Rigbers v. City of Atlanta, 7 Ga.App. 411, 66 S.E. 991; City of New Orleans v. Toco, 141 La. 551, 75 So. 238, L.R.A.1917E, 761, Ann.Cas.1918B, 1032; Carolene Products Co. v. Thomson, 276 Mich. 172, 267 N.W. 608; People v. Carolene Products Co., 345 Ill. 166, 177 N.E. 698; Carolene Products Co. v. Banning (Neb.) 268 N.W. 313; People v. McFall (City Ct. Buffalo) 158 N.Y.S. 974; State v. Old Tavern Farm, 133 Me. 468, 180 A. 473, 101 A.L.R. 810; Logan v. Alfieri, 110 Fla. 439, 148 So. 872; People v. Biesecker, 169 N.Y. 53, 61 N.E. 990, 57 L.R.A. 178, 88 Am.St.Rep. 534; State v. Hanson, 118 Minn. 85, 136 N.W. 412, 40 L.R.A.(N.S.) 865, Ann.Cas. 1913E, 405; People v. Excelsior Bottling Works, 184 App.Div. 45, 171 N.Y.S. 733; State v. Porter, 94 Conn. 639, 110 A. 59; Skaggs v. City of Oakland, 6 Cal.(2d) 222, 57 P.(2d) 478; Brown v. City of Seattle, 150 Wash. 203, 272 P. 517; People v. Schneider, 132 Misc. 349, 230 N.Y.S. 295; State of Minnesota v. Barber, 136 U.S. 313, 10 S.Ct. 862, 34 L.Ed. 455; Jay Burns Baking Co. v. Bryan, 264 U.S. 504, 44 S. Ct. 412, 68 L.Ed. 813; Miller v. Williams (D.C.) 12 F.Supp. 236.

These cases serve to demonstrate that the validity of such ordinances and statutes relating to the exercise of the police power must rest upon a reasonable relation between the remedy adopted and the public purpose to be served, 12 Corpus Juris 929, and that, after all, each case must be bottomed upon its own facts. But these same authorities sustain the view that the primary determination of public need and the character of remedy in the exercise of this police power is in the lawmaking body. The presumption favors validity, and unless the remedy is palpably unreasonable and arbitrary, so as needlessly to invade property or personal rights as protected by the Constitution, the enactment must be sustained. Carolene Products Co. v. Thomson, 276 Mich. 172, 267 N.W. 608. To use the language of Hebe Co. v. Shaw, 247 U.S. 297, 39 S.Ct. 125, 126, 63 L.Ed. 255, found quoted in Anderson v. City of Tampa, 121 Fla. 670, 164 So. 546: "The power of the legislature 'is not to be denied simply because some innocent articles or transactions may be found within the prescribed class. The inquiry must be whether, considering the end in view, the statute passes the bounds of reason and assumes the character of a merely arbitrary fiat.'"

Our own authorities are to like effect. In Barrett v. Rietta, 207 Ala. 651, 93 So. 636 (protection of food from exposure to dust and flies), the rule was expressed in this language: "The exercise

of the authority delegated to or conferred upon municipalities to ordain in aid of the preservation of the public health 'the courts' will not set aside or annul, 'unless the power has been manifestly transcended.' Ehrenreich's Case, 80 Ala. 579, 581, 2 So. 725, 726, 60 Am.Rep. 130." And the same authority quotes with approval the following from 11 R.C.L. 1103: "The tendency of the courts as well as the Legislature is to favor such legislation, and seldom have food laws been held invalid."

And our courts have observed that one of the most important objects of municipal government is the preservation of the public health, and that the law wisely lodges in municipal bodies discretion and power adequate for such purpose. As correctly observed in Spear v. Ward et al., 199 Ala. 105, 74 So. 27, 29: "Consequently, statutes and ordinances dealing with and relating to such subjects, together with provisions for the enforcement thereof, will be indulged by the courts, with the presumptions in their favor, as to their necessity, propriety, and validity, in the absence of a showing to the effect that they are unreasonable, arbitrary, unduly oppressive, or inconsistent with the legislative policy of the state. It must be made to appear to the courts that this police power has been manifestly transcended or abused, before courts will set aside or declare void ordinances which are intended to promote the public health. The special provisions and the extent of such ordinances are matters usually, and almost of necessity, left in a large measure to the discretion and judgment of the municipal authorities. They have, of course, no absolute power to pass any arbitrary ordinance which their caprice or whim might desire; but the law does of necessity vest in them judicial discretion to be exercised reasonably, with regard to the circumstances of each particular case, the objects to be accomplished, and the existing necessity of the occasion."

■ And broadly speaking of the exercise by municipalities of this police power, we have approved the rule of the Supreme Court of the United States that where a given situation admittedly presents a proper field for the exercise of the power, the extent of its invocation and application is a matter which lies largely in legislative discretion, and the courts are loathe to substitute their judgment as to the necessity for a particular enactment for the legislative judgment with reference to its exercise. And if the question as to reasonableness is fairly debatable, the settled rule is that the courts will not substitute their judgment for that of the legislative body charged with the primary duty and responsibility of determining the question. Or, more concisely stated, "if men may reasonably differ in view of all the circumstances," then the legislative action will be sustained. Leary v. Adams, 226 Ala. 472, 147 So. 391, 393. And, as observed in City of Birmingham v. Leo A. Seltzer, Inc., 229 Ala. 675, 159 So. 203, it is not, in such cases, for the court to determine whether the business as conducted by complainant is detrimental to the public, but whether the business as a whole has such tendency.

■ Complainant has shown extraordinary precaution in the manufacture of its ice cream, but the question for the court is whether or not the manufacture as a whole by such counter freezer method, by various ice cream vendors in large centers of population, has a tendency for detriment to the public health. Upon that question, if men may reasonably differ in view of all the circumstances, the courts should not interfere. Has the police power of the city been manifestly transcended in this case? We cannot so declare.

Upon the matter of pasteurization, as previously observed, complainant apparently made no attack upon this feature of the ordinance before the chancellor. No contrary proof upon that question was offered, and all the witnesses, including Keebler for complainant, seemed to assume the propriety of that requirement. Indeed, it may be seriously questioned that complainant is in position to raise any such question as the proof is undisputed it uses pasteurized mix, and that the conflict with the authorities related solely to the failure to have the continuous flow method. Lang's Creamery Co. v. City of Niagara Falls, 251 N.Y. 343, 167 N.E. 464.

But that question aside and undetermined, the most that can be said for complainant's argument as to pasteurization is that it is fairly debatable. Some courts appear to take judicial knowledge as to its effectiveness for the public health. We so read the third paragraph of the opinion of the New York Court of Appeals in Lang's Creamery Co. v. City of Niagara Falls, supra, and such was the express declaration of the Wisconsin court in Pfeffer v.

212

Milwaukee, 171 Wis. 514, 177 N.W. 850, 10 A.L.R. 128. And in State ex rel. Knese v. Kinsey, 314 Mo. 80, 282 S.W. 437, upon which complainant places much reliance, considerable evidence was offered upon the advantages and claimed disadvantages of pasteurization of milk; while in the trial of the instant case, as we have stated, no such issue was made in the proof.

It may be noted also that case involved only the matter of pasteurization of milk, while the ordinance here is concerned only with ice cream, which though a milk product, is yet not so universally used nor so necessary for sustenance of human life. All of which may constitute a point of differentiation from a standpoint of practicability, with which we are not here necessarily concerned.

At best, therefore, for complainant, the matter of pasteurization presents two schools of thought, and is a question upon which reasonable men may differ, a question "fairly debatable." Such being the situation, the duty of the court is clearly to refuse to substitute its judgment for that of the municipal body enacting the ordinance.

Like reasoning is, of course, applicable to the continuous flow method. Complainant in this regard runs counter to a most formidable array of expert witnesses, who not only give their opinion unfavorable to the counter freezer method but their reasons therefor, as well as the proof concerning the matter of feasibility of inspection. This too may well present a question fairly debatable, and, again, we do not feel justified in substituting our judgment for that of the municipal authorities. We cannot say the police power of the city "has been manifestly transcended."

We have examined with much care all the proof, and given serious thought to the case in the light of forceful and helpful arguments for the respective parties to this litigation, and the conclusion has been reached that the learned chancellor correctly ruled in favor of the validity of the ordinance here assailed. No rights of complainant, either under our State or Federal Constitution, are here infringed. The decree will be accordingly here affirmed.

Affirmed.

ANDERSON, C. J., and BOULDIN and FOSTER, JJ., concur.