150 So.2d 374

**Paul DeCARLO**

v.

**JEFFERSON COUNTY BOARD OF HEALTH et al.**

6 Div. 628.

Supreme Court of Alabama.

Feb. 21, 1963.

Bishop & Morris, Birmingham, for appellees.

Monsoud C. Zanaty and Earl McBee, Birmingham, for appellant.

GOODWYN, Justice.

This is an appeal from a judgment of the circuit court of Jefferson County denying appellant's petition for a writ of mandamus against the Jefferson County Board of Health, each member thereof in his official capacity, and the Health Officer of Jefferson County. The evidence was taken orally before the trial court.

The petition seeks to compel appellees to issue appellant a health permit to continue the operation of his grocery store and meat market in Jefferson County. Without such permit he cannot obtain a business license.

The permit was refused because of appellant's failure to comply with a health regulation providing that "passage from living or sleeping quarters into the area where food is handled shall be impossible except by outside entrances." There is a door between appellant's living quarters and his food handling establishment. This condition had existed for many years prior to adoption of the regulation.

Section 85, Tit. 22, Code 1940, as amended, provides, in pertinent part, as follows:

"The state committee of public health shall, as conditions demand, adopt and promulgate regulations for the construction, maintenance, and operation of all establishments, and their immediate surroundings, in which foods or beverages intended for sale for human consumption are made, prepared, processed, displayed for sale in an unpackaged state, or served; * * *. Copies of the said regulations shall be furnished to county health officers, who, as authorized representatives of the state health officer, shall enforce such regulations within their respective jurisdictions. This section shall not restrict the power of county boards of health, nor of municipal corporations, to adopt more stringent, emergency regulations or ordinances, respectively. * * *"

On February 20, 1957, the State Committee of Public Health, acting for the State Board of Health, pursuant to the foregoing statutory authority, adopted certain regulations covering the construction, equipment, maintenance and operation of food handling establishments. These regulations were adopted by the Jefferson County Board of Health on May 15, 1957.

The particular portion of the regulations here involved is the following part of Item 15 of § 7, viz.:

"ITEM 15. MISCELLANEOUS REQUIREMENTS: No unpackaged food shall be handled in any manner in any room used as living or sleeping quarters: Any room used for living or sleeping quarters shall be separated from all rooms in which food handling operations are conducted by a dust-tight wall, and passage from living or sleeping quarters into the area where food is handled shall be impossible except by outside entrances; * * *.

* * * * * *

"SATISFACTORY COMPLIANCE: This item shall be deemed to have been satisfied if:

* * * * * *

"Sub-Item 2. Living and sleeping quarters, and food handling operations, are within the same building they are completely separated by a dust-tight wall, and passage from one to the other is impossible except by way of outside entrances. (A self-closing door may satisfy this sub-item for a 'Grade B' establishment.)"

This is made applicable only to Grade "A" food handling establishments (§ 7, Regulations). A self-closing door is permitted in Grade "B" establishments (§ 8, Item 1, Regulations). However, there seems to be no disagreement between the parties that the foregoing requirements with respect to Grade "A" establishments have been made applicable to all food handling establishments in Jefferson County (§ 2, Regulations). Apparently, this was done by action of the County Health Officer (§ 2, Regulations), but we do not understand appellant to question his authority, under said § 2, to determine whether the Grade "A" requirements must be complied with in Jefferson County (that is, if § 2 is otherwise valid).

Appellant makes a two-fold attack on Item 15 of § 7, which may be stated, in substance, as follows:

(1) This is a legislative provision which neither the State nor the County Board of Health had authority to adopt; and § 85,

Tit. 22, as amended, supra, purportedly giving such authority, is invalid in that respect because it is an unlawful delegation of legislative power.

(2) Such regulation is unreasonable, arbitrary, discriminatory and unjust, and serves no useful purpose in conserving, protecting or promoting the public health.

We are unable to agree with either of these contentions.

### (1)

■ The first contention is adequately answered by the holding in Parke v. Bradley, 204 Ala. 455, 456, 458, 459–460, 86 So. 28, 29, where it was said:

"It is too well settled for further controversy that the Legislature of Alabama may delegate to officers, or boards, or commissioners, of its own creation and appointment, various governmental powers for the more efficient administration of the laws, subject always to the clearly implied limitation of the Constitution that the lawmaking power, invested exclusively in the Legislature, cannot be delegated to any other department of the government, or to any other agency, either public or private. * * *

"The prevention of disease and the conservation of health, by all of the means known to modern science, is universally recognized as one of the most important and imperious duties of government, and in the construction of statutes enacted for such a purpose, under the police powers of the state, courts are agreed that great latitude should be allowed to the Legislature in determining the character of such laws, and how, when, and by whom, in their practical administration, they should be applied. * * *

"The authority and jurisdiction of the state board of health are defined by section 702 of the Code, as amended [Code 1940, Tit. 22, § 7]. Its powers

are purely executive and administrative, except that under subdivision (6) it is authorized 'to adopt and promulgate rules and regulations providing proper methods and details for administering the health and sanitary laws of the state, which rules and regulations shall have the force and effect of law, and shall be executed and enforced by the same courts, bodies, officials, agents and employes as in the case of the health laws'; and the knowing violation thereof is made a misdemeanor, punishable as provided by section 7073 of the Code [Code 1940, Tit. 22, § 103].

\* \* \* \* \* \*

" * * * Whether the medical association of the state be regarded as a private, or a public, or a quasi public corporation is, we think, wholly immaterial; for that association, as such, is not invested with any power or authority whatever. On the contrary, recognizing its peculiar aptitude for the important and responsible service required, the state has availed itself of a ready-made organization of professional and practical medical scientists, and has by legislative fiat converted it bodily into a state board of health, and to this public board, not to the state medical association, the Legislature has granted authority and jurisdiction in the premises. * * *

"We are advised of no constitutional inhibition against such legislative action. The implied limitation against any delegation by the Legislature of its lawmaking power is in no way involved or concerned; for, if it were conceded that subdivision (6) of section 702 of the Code, above referred to, is an unconstitutional grant of legislative power, and therefore invalid, its elimination would not affect the structure of a system otherwise complete and subject to no constitutional objection.

"But it is thoroughly well settled by the decisions of this, as well as other states, that the implied limitation

against the delegation of the lawmaking power was never intended to prevent Legislatures from authorizing their own appointed agencies to make such minor rules and regulations as are necessary or appropriate for the administration and enforcement of the general laws of the state. State v. Montgomery et al., Excise Commissioners, 177 Ala. 212, 240, 59 South. 294; Ferguson v. Starkey, 192 Ala. 471, 68 South. 348; Fox v. McDonald, 101 Ala. 51; 69, 70, 13 South. 416, 21 L.R.A. 529, 46 Am.St.Rep. 98; 12 R.C.L. 1265, § 3, and cases cited; 12 Corp.Jur. 847, § 330.

" 'Any power not legislative in character which the Legislature may exercise, it may delegate, and before a court can properly hold that a statute is void as unconstitutionally delegating legislative power, it must clearly appear that the power in question is purely legislative.' 12 Corp.Jur. 840.

" 'The Legislature cannot delegate to private corporations the power to make laws. It may, however, employ them in an administrative capacity to carry a law into effect, or to select or appoint officers for the purpose, and may authorize them to make reasonable rules and regulations for the conduct of their business.' 12 Corp.Jur. 843, § 328; Crescent Live Stock Landing, etc., Co. v. New Orleans, 33 La.Ann. 934; Slaughterhouse Cases, 16 Wall. 36 [83 U.S. 36] 21 L.Ed. 394.

"These authorities will serve to illustrate the latitude accorded to Legislatures in choosing and empowering the appropriate agencies for the administration of the laws, and the promotion of the public weal.

\* \* \* \* \* \*

"As we have already stated, the present structure of the state board of health has existed, under public statutes, since 1875, a period of nearly half a century. So far as we are advised, its legality has never been questioned, and two constitutional conventions have met and adopted new, and readopted old, constitutional provisions, without undertaking to curb this notorious and extended exercise of legislative power.

"We are in accord with the view that—

"Old age cannot give validity to a void statute, nor will acquiescence for any length of time, nor any amount of practical construction, prevent a court from declaring void a statute which clearly contravenes the Constitution.' 12 Corp.Jur. 798, 799; Boyd v. Alabama, 94 U.S. 645, 24 L.Ed. 302.

"But the uniform legislative interpretation of doubtful constitutional provisions, running through many years, is of weighty consideration with the courts.

\* \* \* \* \* \*

"The constitutional inhibition here invoked by complainants is implied and not expressed, implied from those express provisions, such as are found in sections 42 and 43 of the Constitution of 1901, brought down from the first Constitution of the state, and apportioning the various functions of government, executive, legislative, and judicial, to separate and distinct bodies of magistracy, and confining each body to its appropriate functions, except as otherwise expressly provided.

"The limits beyond which a Legislature thus constituted may not go in the delegation of those portions of its sovereign power which are not strictly legislative in character have never been clearly and certainly defined. A study of the laws and decisions of this and other states will show that there has always been a twilight zone within which the legislative practice has vacillated and judicial opinion has varied, with respect to the exercise of that

prerogative. The tendency of the courts, as the guardians and expounders of Constitutions, has been and is to accord to legislative action of this character the utmost liberality that is possible, consistently with the preservation of the organic structure of their governments."

See, also: Heck v. Hall, 238 Ala. 274, 282, 190 So. 280; Gilchrist Drug Co. v. City of Birmingham, 234 Ala. 204, 210, 211, 174 So. 609, 111 A.L.R. 103; Compton v. Alabama Power Co., 216 Ala. 558, 561, 114 So. 46; Walker v. City of Birmingham, 216 Ala. 206, 209, 112 So. 823; Wheeler v. River Falls Power Co., 215 Ala. 655, 657, 111 So. 907; State ex rel. Bond v. State Board of Medical Examiners, 209 Ala. 9, 11, 95 So. 295; Barrett v. Rietta, 207 Ala. 651, 652, 653, 93 So. 636; Herbert v. Demopolis School Board of Education, 197 Ala. 617, 619, 73 So. 321; Ferguson v. Starkey, 192 Ala. 471, 473, 68 So. 348; Town of Greensboro v. Ehrenreich, 80 Ala. 579, 581, 2 So. 725, 60 Am.Rep. 130; State v. McCarty, 5 Ala.App. 212, 59 So. 543; 25 Am.Jur., Health, § 5, pp. 288–290; 16 C.J.S. Constitutional Law § 138b(19), pp. 617–619.

### (2)

The following from appellant's brief states the substance of his position with respect to his second contention:

" * * * The air-conditioned store and market is operated so as to include the air-conditioned dwelling of petitioner and his wife under the same roof with a connecting door.

"The question of the door connecting the living quarters with the part of the building used for the conduct of the grocery business and meat market is the question at issue. * * *

\* \* \* \* \* \*

"The permit in question was revoked by the County Health Officer for a failure to permanently close and seal the door in question.

"Petitioner and some 300 white small merchants in similar position to that of petitioner operate small grocery businesses, in which is included a small meat market department, in various parts of the County of Jefferson in areas entirely, or largely, surrounded by Negroes. Due to competition from the numerous large supermarkets, these small merchants are required to keep their doors open from early in the morning until late at night. Because of this fierce competition, they are required to operate these businesses with the smallest possible working staff. In substantially every case the operation is conducted by the husband and wife, and, in many instances, by the wife alone for a great deal of the time.

"In every case, the building in question has existed, and has been used, with the connecting door between the store and living quarters for many years, in most cases from twenty to forty years, before the regulation in question was adopted. This arrangement is and has been a matter of practical necessity to the very existence of these small merchants for reasons of safety due to the location of the stores in Negro neighborhoods. Large amounts of cash are required to be kept in connection with such operations. The connecting door permits a large part of the money to be kept in the living quarters or residence part and provides a safe means of transporting necessary cash back and forth. Otherwise, the woman operating the store, or the man and woman, would be subjected to exposing themselves in the dark for distances in many cases as much as 50 yards, or more, and to the danger and fear of being robbed.

"The doors also serve as a fire exit and as an access to restroom and rest facilities. This is important because of the great burden in terms of time placed upon a very small work force, the wife, the husband, or possibly both,

who are compelled to work long hours to eke out an existence.

"The verified petition as amended attacks the regulation in question and the enforcement thereof on the ground that the same is unreasonable, arbitrary, unjust and unconstitutional.

"Specifically, it is contended by petitioner that such regulation * * * serves no useful purpose in conserving, protecting or promoting public health; there is no reasonable relationship between the said regulation and the conservation of, protecting or promoting public health; * * *.

"While the petition was filed by Paul DeCarlo, who does business as DeCarlo Grocery or DeCarlo Foods, this case was treated by petitioner and also the Jefferson County Board of Health as a test case to test the invalidity of said rule hereinabove quoted as applied to the some 300 small merchants, all of whom are White, of Jefferson County in like situation with that of the petitioner."

The reasoning behind, and basis for, the regulation can best be given by quoting the following from the testimony of several of the medical and sanitary experts who were witnesses in the case:

Dr. George A. Denison, Health Officer of Jefferson County:

"Q. Does the size of Jefferson County—when I say size, I am speaking of population—have anything to do with the system of scoring, or I believe you said grading, was not the correct term, the system of scoring that has been adopted in Jefferson County?

"A. Well, the procedure is uniform so far as the regulations are concerned, and so far as their application. There is a difference in need for control program in a County like Jefferson over and above that with the requirements to meet the needs in a County like Coosa. Where you have large groups of people and large operations, your control has to be more exacting. There are some counties in Alabama, for example, that has no enforcement of a milk control ordinance, and there are strict rules that let them get by with it, and we couldn't possibly think of such a thing here.

* * * * * *

"Q. Specifically referring to Item 15 of Section 7 that I read previously, did you recommend that this regulation be incorporated in the group of rules and regulations?

"A. Yes, I did. It is a standard provision that is generally recognized as necessary for protection of public health.

* * * * * *

"Q. Now, doctor, based upon your years of experience in Public Health Service, and in the field of preventive medicine, upon your education and training; upon your observation of health conditions in general in this community and in this area, and upon your observation of the application of health regulations, to the prevention of the spread of disease, do you have an opinion as to whether or not the item which I read, specifically the first sentence of Item 15 of Section 7, contained in Respondent's Exhibit 1, is a Regulation which is reasonably calculated to combat a public health menace?

"A. In my opinion, it is.

"Q. What considerations led you to have that opinion, sir?

"A. Well, it is fundamental in Public Health work insofar as food control is concerned, to have a complete separation of any commercial food supply from any domestic source of possible contamination. In other words, people don't cook food or prepare food in their kitchens at home and sell them commercially. The reason for that I think is obvious. The diseases which may be in

the family subject that food to possible contamination and infection of other people.

"That is the basic reason for requiring the closed door, in order that there may not be contamination either directly by infected people, or indirectly by contamination of food that they may handle.

"In other words, transfer the infection from the domestic quarters into the business area.

"It is particularly significant to that insofar as children are concerned, because I don't think children have yet developed good standards of personal hygiene.

"As I have often said, they wash their hands about as often as they wash the back of their neck, they are a public health hazard in spreading contamination.

"One of the reasons, of course, why the so-called childhood diseases occur so early in the age of children is because they have not yet developed habits of personal hygiene which protects themselves against each other.

"Q. Rather than, or other than just the filth that might accumulate on a child's hands and body from normal activity, is there any other reason why the fact that most children, younger children have not developed personal hygiene habits that are as highly developed as older people, why that would constitute an area of possible contamination to foods that they are around?

"A. Well, the average age of scarlet fever and streptococci infections is at a pretty tender age, and it is a very common widespread disease that presents an additional hazard insofar as children in a store would be concerned.

"Q. Is there any specific hazard presented by children who are not toilet trained?

"A. Well, certainly there is.

"Q. What I am asking you, actually, doctor, any specific diseases or infections that can be attributed to that type of lack of training?

"A. Well, dysentery of infants and young children certainly is an important disease. Any intestinal disease would be more liable to be transmitted by children who are not toilet trained.

\* \* \* \* \* \*,

"Q. Does the presence of dogs, cats, or other animals have any particular significance or present any hazard to food handling establishments, particularly where unpackaged food is stored or kept for sale?

"A. Well, they are highly undesirable in food establishments. It is ethically objectionable and certainly conceivable with the filth they can ordinarily carry, they can bring in disease and contaminate food in an establishment. Dogs have a peculiar habit of raising a foot and using one post, and the post can be in a grocery store.

"Q. Doctor, referring again to Item 15 of Section 7, as contained in Respondent's Exhibit 1, and specifically the first sentence thereof that we have been speaking about, in your opinion, sir, insofar as this regulation relates to the general health and welfare of the community in general, and when I say the community, I am speaking of specifically Jefferson County, in your opinion, is this a reasonable regulation?

"A. In my opinion, it is entirely reasonable.

"Q. Does it have a definite value as a protective measure for the public health?

"A. It does.

\* \* \* \* \* \*

"Q. And, of course, if he had a child that lived in the home, and the child came out the side or back door,

and walked around and used the customer's entrance, the child would bring the same diseases that he might have or germs that he might have upon him, or in his body, would he not?

"A. He would.

"Q. And you couldn't control the germ by putting a door, or not putting a door, could you?

"A. Well, the convenience of the closed door would preclude some of that visitation, of course.

\* \* \* \* \* \*

"A. Well, if the door is open, the storeroom is a part of the house, it is the living room or whatever you want to make out of it; if it is closed, it isn't.

\* \* \* \* \* \*

"Q. Now, do you know, sir, whether the actual enforcement of that regulation was begun immediately, or in July, or when it was begun?

"A. The provision insofar as the open door is concerned, that was withheld for a year and a half. I mean we gave a year and a half for people to comply.

"Q. Do you know whether there are any regulations of either the Jefferson County Board or Alabama State Board of Health having to do with the prevention of animals going into the food handling establishments?

"A. It is a general rule, general requirement, yes.

"Q. That they are not permitted to go into food handling establishments?

"A. Yes.

"Q. Do you know of any regulation that prevents animals from going into houses or dwelling places?

"A. No, sir."

*W. R. McLean,* employed by the U. S. Public Health Service as milk and food consultant for six southeastern states:

"A. Well, you have two problems, as we see it, we try to prevent the spread of food born diseases, and it is very difficult to do it where you create a condition, for instance, you have the human element involved in living quarters with a direct opening, and you also have animals, and if you are not there, it puts you sort of on the spot as to whether you can enforce the regulation unless you make it impracticable for animals particularly to migrate back and forth. Certainly, an operator wouldn't permit them to come in off the street, but where you have them in the living quarters, it is very difficult to control when you are not there.

\* \* \* \* \* \*

"A. There are other health aspects, of course, to it. It is very difficult to determine whether someone is ill on the premises, one example. That is one that came out in the testimony earlier, of which we have no basic control; I am thinking of communicable diseases where we used to quarantine residences, and that is no longer practiced except in certain specific diseases.

"We wouldn't have any reason to know whether anybody was sick or not, and if they are sick, chances are these diseases are rapidly spread, they would be bedfast, and we don't inspect premises, and have no intention to inspect premises; we feel that we have a safeguard, if it is not part of the establishment or in his operation or directly connected with it.

"You might say by the same token, you could spread disease by the man off the street; certainly if that man is ill, he wouldn't be on the street; we cannot control everything, but as I said a minute ago, we like to prevent as much as we can on the control of food-born

outbreaks, and we feel it is conducive to getting out of hand by permitting passageways between food establishments and residences directly.

\* \* \* \* \* \*

"As I tried to make clear, there are two factors involved; being spotless is conducive to control of communicable diseases or food-born outbreaks.

"The other thing is we have no assurance that other traffic than the people that own or operate the store might come into the picture, such as animals, birds, cats, dogs, or anything else.

"You have that; that is a gamble. The place could be spotless, but they also carry disease. That is the thing that has been very difficult to—as far as enforcing the problem even with a door.

\* \* \* \* \* \*

"Q. In other words, you are saying that the fact of the animals, and the human beings going back and forth, would be the primary cause?

"A. Well, they are potential, yes, sir.

\* \* \* \* \* \*

"I don't believe that the plaintiff here would permit dogs off the front to come in through the front door, it is forbidden in all places, and regulations that I know of; it would be an accident if they did.

\* \* \* \* \* \*

" \* \* \* I think it is against any regulation that I know of, no animal or fowl is permitted in a store, grocery store or place where you serve food, \* \* \*.

\* \* \* \* \* \*

" \* \* \* Supposing that he became ill, and he was bedfast, and someone else operated the store and leaves the door open, there is nothing in the world to give you an assurance or me, if I am a customer, that I can't get the disease if the door is open. I thought the doctor brought that out, by reason of air current, or breathing the air; maybe he has an all air conditioned store.

\* \* \* \* \* \*

"Q. Would your testimony be, sir, that the reason—just because there had not been a direct tracing of an epidemic to an evil that is sought to be eliminated, a certain regulation, that that regulation is unreasonable?

"A. No, sir, I think I mentioned earlier that we tried to prevent the spread of disease by practical control through regulations. And if a particular portion of a regulation is not practical, then we try to remedy it in some other means.

\* \* \* \* \* \*

"Q. Do you have any regulation which would have to do with the health permit being required of people who live in a house that is connected with the residence?

"A. No, none that I know of.

"Q. Do you anticipate that you could enact such a regulation?

"A. I don't think that you can regulate the individual in his home, not with a health card.

"Q. And would you say, sir, that there is a menace or a danger to the public health, is present by a person who lives in the residence being inflicted with disease even though that person is not the operator or the person who directly handles the food in the food handling establishment?

"A. There is always that danger, because you have no control over the individual in going from the residence to the business establishment."

*Dr. D. G. Gill,* State Health Officer:

"Q. Now, doctor, will you give us some of the considerations that were taken into account in promulgating these specific items—this Item 15 that I have referred to—Item 15, Section 7, concerning the open doorway between the residence and the food handling establishment?

"A. Well, I think the answer to that is rather simple, in that certain standards can be established and set up for rooms and quarters in which unpackaged food is handled.

"Now, the minute that you have an open doorway from that room into another one, then actually your standard should go beyond that open doorway, and you should include the space beyond. And the thinking back of this particular regulation was that it was impracticable to set up any sort of standard for quarters that were going to be used for living quarters.

"It may also have been an intrusion on private living and so on. But from the point of view where food might be handled, you have to draw a line somewhere. It seems logical to close off the room in which unpackaged food is being handled and cut it off completely from quarters that may be clean in many instances, and in many instances, they may not, but quarters over which you have no control as to people in there; their living habits and what they are doing.

"And for that reason, we have confined our regulations to actual quarters in which unpackaged food is being handled.

"Q. Now, doctor, what was some of the specific menaces, if there were any, which this regulation was so designed to combat?

"A. You could name most any of your communicable diseases as possibility of spread. Particularly, I would say, of course, your nose and throat infections, which might be anything from diptheria to scarlet fever to staphylococcic infections of the throat, or common cold.

"It could include tuberculosis, and it could include your intestinal group of infections. And certainly a regulation is not going to keep an individual with any of those from walking into the store, but it does keep a family that may have these, and who is going to live there with them, from coming into the food handling part of the business.

"Q. Other than the actual passage of persons from the residence into the food handling establishment, is there any other danger of the spread of disease coming through this open door?

"A. Well, it is subject to some controversy, of course, but I don't think there is any question but that certain of these diseases are air-born. So that if air is circulating, it will carry with it certain droplets—droplet infections, particularly in the nose and throat group of infections.

"Q. Doctor, could an open door between the residence and the food handling establishment promote any type malpractice on the part of the operator of that establishment?

"A. It might make it easier. I am inclined to believe that anybody who wanted to do a malpractice, could do it anyway. But I think it would make it a little simpler for them to come through.

\* \* \* \* \* \*

"I think it is a reasonable regulation."

*Guy Tate,* employed by Jefferson County Board of Health as Director of Bureau of Sanitation:

"I think very little has been said about the possibility of domestic ani-

mals belonging to the people that occupy the living quarters, and it would be quite convenient at night, instead of turning the cat out, to turn him into the store, which he would have access to climbing all over the food, and the same thing as to dogs; and also the sink and hand-washing facilities that are required by the regulation, could be very easily used to do the family wash after hours, and permit very insanitary conditions taking place.

"And another thing which was considered very seriously was the fact that unfortunately we have some operators, I do not know of any, thank goodness, that might be unscrupulous, and would be able to hide or store uninspected foods of a low caliber, and sell it at lower rates to people, friends or individuals; whereas, if they had to go outside and go through a public street or out in the yard in the open, it would certainly discourage them from doing that type of thing.

"Another thing that we might deal with, we don't know of any case, but it would be quite simple for a delicatessen or someone running a store of this type, to sell potato salad or any prepared food which was prepared in their kitchen, and we have no means or access to their kitchen for inspection, and wouldn't have a right to do it if we wanted to.

\* \* \* \* \* \*

"Q. Based on the education, experience and experience you have had in the field of sanitary engineering, particularly in Jefferson County, your familiarity with sanitation problems and health problems in Jefferson County, do you have an opinion, sir, as to whether or not Item 15 of Section 7, that we have been referring to is the regulation which is reasonably calculated to combat a public health menace?

"A. I think it definitely is \* \* \* a basic public health preventive measure.

\* \* \* \* \* \*

"Q. Now, you do have a regulation against having animals and live fowl in the store any place?

"A. That is a part of this same situation, the same regulation.

"Q. So a person would be in violation of this particular regulation against the allowing of animals in the store whether he had an open door or not? I mean an unsealed door or not, would he not?

"That is true; the point I am trying to make, it would just be easier for them to get in there."

The right to conduct one's business in a manner agreeable to him is subject to such regulations as may be reasonably imposed under the police power, and if a regulation is helpful in exercising the police power, and is not discriminatory or unduly burdensome, the courts will not nullify it. Allinder v. City of Homewood, 254 Ala. 525, 49 So.2d 108, 22 A.L.R.2d 763. See, also: Barrett v. Rietta, 207 Ala. 651, 652 (1), 653(4), 93 So. 636, supra; Town of Greensboro v. Ehrenreich, 80 Ala. 579, 581, 2 So. 725, 60 Am.Rep. 130, supra.

Under the evidence, heard orally by the trial court, we would not be warranted in reversing the judgment of that court denying the writ of mandamus. We cannot say that the regulation here under review (Item 15 of § 7) is so unreasonable, arbitrary, discriminatory or unjust, as to render it invalid and unconstitutional.

The judgment denying the writ of mandamus is due to be affirmed.

Affirmed.

LIVINGSTON, C. J., and LAWSON and COLEMAN, JJ., concur.