**McKENNA v. CITY OF GALVESTON et al.**
No. 10535.

Court of Civil Appeals of Texas. Galveston.
Jan. 27, 1938.

Rehearing Denied Feb. 17, 1938.

Geo. P. Prendergast and William Stiglich, both of Galveston, for appellant.

Bryan F. Williams, City Atty., of Galveston, for appellees.

GRAVES, Justice.

This much of the brief, filed herein for the appellees by Hon. Bryan Williams, city attorney of Galveston, thought to be both correct in its recitations of facts and sound in its conclusions of law, after only such revisions. deletions. and additions as

change neither its material substance nor purport, is adopted as the court's opinion upon this appeal, to wit:

"Appellant, a retail dealer in and manufacturer of ice cream, conducting his business upon premises in the City of Galveston, brought this action to enjoin the enforcement against him of an ordinance of the city, which in substance prohibits the sale in the city of ice cream not pasteurized and frozen upon the same premises in the city; a copy thereof being attached hereto as 'Exhibit No. 1.'[1]

"Appellant alleged that the ice cream manufactured and used by him was frozen upon his premises from ice cream and ice cream mix manufactured in the city of Houston by the Double Dip Ice Cream Company, with which he had a contract to supply his needs from March 1, 1936, to December 31, 1936, and that the ice cream and ice cream mix, which was being supplied to him from that source, came from a plant where it was properly pasteurized, and that it was transported from the city of Houston to his premises in refrigerated trucks, and was in fact pure and wholesome and safe for human consumption. He attacked the ordinance as being—not a safeguard to the health of the city's inhabitants—but a measure the effect of which is to protect dealers who pasteurize and freeze their ice cream within the city from competition from those without the city, and asserted that the enforcement of the ordinance against him, which was being threatened by officials of the city, if allowed, would destroy his business and violate his constitutional rights.

"The trial before the court, without a jury, resulted in a judgment for appellees under which appellant was denied the writ he sought. Upon his request the court filed findings of fact and conclusions of law. * * *

"First Counter Proposition.

"The ordinance here under attack is a valid exercise of the powers of the governing body of the city to enact measures reasonably adapted to safeguarding the health of the city's inhabitants, and has not been shown herein to be invalid as an arbitrary or unreasonable exercise of that power.

"All the testimony in the case came from witnesses placed upon the stand by appellant.

"He called as expert witnesses Dr. Walter Kleberg, health officer of the appellee city, Professor Asa C. Chandler, professor of biology at Rice Institute, Dr. Wilmer Stephenson, director of labora-

---

[1] "Exhibit No. 1.

"An ordinance requiring the pasteurizing of milk and milk products used in the manufacture of ice cream sold, offered, exposed or kept for sale in the City of Galveston: Requiring such pasteurization to be done on premises located in the City of Galveston and on which such ice cream is frozen; making a violation of its provisions a misdemeanor and prescribing a penalty.

"Be it ordained by the Board of Commissioners of the City of Galveston:

"Section 1. The term 'milk product' as hereinafter used, shall be taken to mean and include any substance, liquid or solid, made or derived wholly or in part, from milk.

"Section 2. The term 'pasteurized', as hereinafter used, means and shall be taken to refer to the process of heating milk, or any milk product, as defined in the above Section, to a temperature of not less than one hundred forty-two (142 degrees) degrees Fahrenheit and holding not less than one hundred forty-two (142 degrees) degrees Fahrenheit for not less than thirty (30) minutes in pasteurization apparatus approved by the Health Officer of the City of Galveston, the temperature and time being automatically recorded by a temperature and time recording device approved by the Health Officer.

"Section 3. It shall be unlawful for any person, firm, association or corporation, or his, or its or their agent, to sell, offer or expose for sale in the City of Galveston, or have in his, its, or their possession in the City of Galveston for the purpose of sale, offering or exposing for sale therein any ice cream made from or with milk or any milk product not pasteurized on premises situated within the territorial limits of the City of Galveston and frozen on the same premises where pasteurized.

"Section 4. Any person, firm, association or corporation violating this ordinance shall be deemed guilty of a misdemeanor and upon conviction thereof be punished by a fine of not less than Twenty-five ($25.00) Dollars nor more than Two Hundred ($200.00) Dollars.

"Section 5. This ordinance shall take effect upon its due publication in the manner prescribed by the charter of the City of Galveston."

tories and research at Jefferson Davis Hospital at Houston, and Mrs. Ida Levinson, bacteriologist of the health department of the city of Houston.

"According to the testimony of Dr. Kleberg, the disease-producing germs which can get into milk are those causing typhoid, diphtheria, scarlet fever, and septic sore throat. Pasteurization kills those harmful germs when properly carried out. After pasteurization there are other bacteria left in the milk, but they are harmless. Freezing does not kill the pathogenic germs. They just lie dormant in the frozen mixture and when it becomes warm at a suitable temperature they commence growing. If ice cream made from milk infected with typhoid germs were eaten, those germs would most certainly become active in the human body, and freezing is no safeguard against disease-producing germs whatever. If the milk were pasteurized for a less length of time than that required by the ordinance, the process would not kill harmful germs. To make the pasteurization effective, it must be properly done, maintaining a temperature of 145 or 150 degrees, and kept there not less than 30 minutes—it can go 40 minutes. That will kill the pathogenic germs and destroy a great many of the harmless ones, but there will be harmless germs left, and if the milk or mix is allowed to get up to a sufficiently high temperature, they will begin to grow and increase.

"No other witness disputed or disagreed with that testimony.

"Dr. Kleberg further testified:

" 'That it is not so much the number as the kind of bacteria that produce disease. A bacteria count is made by taking a sample that is diluted with water and placed on a Petri dish, and then put into an incubator where it is allowed to grow for 24 hours, and it is counted and multiplied by the times it has been diluted, which gives the number per cubic centimeter. That count does not necessarily indicate that the milk or mix has disease-producing bacteria in it. But if the count goes high, it is a danger-signal to indicate that he must investigate. When the count is found to be high, the measures a health-officer takes to determine whether the milk is likely to have harmful bacteria is to go to the source of it and see if the man has properly pasteurized

that mix before he has put it in his freezing machine, and to see that the employees and help are free from any disease-carrying germs, such as typhoid and diphtheria carriers. In other words, he makes an inspection in order to determine the cause of that high bacteria count. They would go through the whole personnel and find out whether they are tubercular subjects, or have diphtheria carriers, or sore throats, and they take a look at their hands and finger-nails. They look at the machinery, the pasteurizing vats, their utensils, as to whether they are clean, what mode of disinfection they use, their washing process, whether they have separate toilets for the personnel, whether they have washing-basins and proper towels, and of course the airator, see if the pipes are clean and the proper temperature maintained while the milk is being cooled, and then look into their ice cream mixers to see that they are properly sterilized and the temperature is properly maintained.'

" 'After the mix is pasteurized, if it is not properly handled you just re-contaminate it. You have undone what you you have done. If an opportunity is given for the entry of disease-producing germs after it is pasteurized, they will be just as dangerous as if it was not pasteurized. The more times milk is handled after its pasteurization before it reaches the consumer, the greater number of risks are introduced as to contamination. Handling of milk and milk-products is one of the greatest sources of contamination. If ice cream mix were properly handled in the pasteurization plant but was then handled by men loading and unloading the trucks, the prior process would not insure that it would not be contaminated before it reaches the consumer. The more handling that is done the greater danger of contamination. From his experience (11 years as health officer) witness does not know of a more effective means to safeguard consumers of milk and milk-products than a rigid inspection of the places where it is produced, the persons handling it, and the conditions under which it is produced.'

"Dr. Chandler testified: 'With reference to the introduction into the human body of pathogenic germs through food, the greatest danger of disease from such a source is in milk and milk-products. Because milk is a very excellent culture medium for the growth of many different

kinds of organisms, and therefore special care must be taken in pasteurizing the milk and milk-products. Freezing does not act as a sterilizer. It could not take the place of pasteurization. Pasteurization is the only method of ridding milk and milk-products from pathogenic germs that has come into general practice. As to what practical means there are for a health officer to determine whether or not milk has been properly pasteurized, the only method that can be employed for that purpose is by inspections of the apparatus used, the persons handling the milk, and the process employed at the particular plant where the pasteurization is done. * * * The bacteria count does not indicate whether there are pathogenic bacteria present or not. There is no practical method available for determining the presence of most kinds of pathogenic germs. * * * Nothing, however, in the pasteurization of milk would insure it against contamination thereafter, and the more it is handled after pasteurization the greater the risks of contamination. * * * Chilling would prevent a rapid growth of the bacteria and if the temperature were low enough, it would arrest the growth entirely. But it would not destroy the pathogenic-germs immediately or within the near future. So that, if germs of that character were introduced in ice cream-mix which was consumed, they would become active when they got into the human body.'

"Dr. Stephenson testified: 'Bacteria-count doesn't show whether or not the bacteria contain pathogenic-germs. As a practical matter, it is necessary in addition to taking proper samples and making bacteria-counts with reference to milk-products to take measures to see that milk is handled under proper sanitary conditions. It would not be safe simply as a health-measure to take samples of bacteria without taking other measures relating to the premises where the milk is produced, the manner, the utensils used, and the persons handling it. So, an inspection of the premises is a matter of considerable importance in insuring a safe milk supply. Every time the milk-product is handled by human hands an additional risk of contamination is added.'

"Mrs. Levinson testified: '* * * Freezing is no safe-guard whatever against pathogenic-germs. The most ordinary sources of contamination of milk and ice cream after it is frozen are unclean apparatus, improper handling, or handling by infected persons. In order to safe-guard the mix after it has been pasteurized and frozen, it would be necessary to see that the apparatus, utensils, and the handlers themselves were free from infection. Bacteria-count will not necessarily disclose the presence or absence of pathogenic-germs. Witness wouldn't say that it would be safe to rely upon bacteria-count, without some knowledge of the premises and handling of the product. The bacteria-count would have to be supplemented by inspection of the premises upon which the milk was produced.'

[redacted]

"The evidence further shows that ice cream mix is the mixture of milk, sugar, and eggs, if they are used, prior to being frozen. In order to make it into the finished product, ice cream, it is necessary to add the flavoring and freeze it. * * * The mix when it arrived at appellant's place was at a temperature of about 35 degrees above zero. He had what was called a holding box of a capacity of about 525 gallons and a dispensing box. He had no means for pasteurizing. After the mix was received by him, he had added fruit and flavoring and put it into a counter freezer to freeze. * * *

"Authorities: Charter, City of Galveston, § 34 (V); City of New Braunfels v. Waldschmidt, 109 Tex. 302, 207 S.W. 303, 306; Gilchrist Drug Co. v. Birmingham, 234 Ala. 204, 174 So. 609, 111 A.L.R. 103; Witt v. Klimm, 97 Cal.App. 131, 274 P. 1039.

"Argument.

"Section 34 V of the charter of the City of Galveston delegates to the Board of Commissioners, among other powers, these: 'To regulate and determine the mode of inspecting and vending milk * * * and to provide a system for the inspection of milk and milk products and to prohibit the sale of milk and milk products unless the party offering the same for disposition or sale shall have complied with any and all regulations made by said Board of Commissioners with respect thereto, and to prohibit the vending and disposition of milk or milk products within the limits of the City of Galveston unless the party desiring to vend or dispose of such milk or milk products shall have secured or obtained from the Health Physician of

610

the City of Galveston a permit so to do, under such regulations as the Board of Commissioners of said city may from time to time provide.'

"It is, therefore, clear that to the appellee city there has been delegated broad powers to take fit and suitable measures to protect the· health of its inhabitants from unsafe or unsanitary milk and milk products.

■ "The determination as to what measures to take in that respect rests primarily with the city's governing body, and the ordinance here attacked, being the result of the exercise of that body's judgment and discretion, must be by this court viewed as prima facie valid, and to justify this court in setting it aside or declaring it to be an illegal attempted exercise of power by the governing body of the city, its unreasonableness and want of necessity for it as a measure for the protection of health 'must be clear, manifest, and undoubted, so as to amount, not to a fair exercise, but an abuse of discretion,·or a mere arbitrary exercise of power.' City of New Braunfels v. Waldschmidt, 109 Tex. 302, 207 S.W. 303, 306.

■ "Certainly it cannot be said that the evidence adduced by the appellant in this case is such as to compel the court to say that ·the requirements of the ordinance have no reasonable basis and that its unreasonableness and want of necessity as a health measure are 'clear, manifest, and undoubted.' While some of the expert witnesses expressed the opinion that there would be no danger to the health of the city's inhabitants from ice cream·frozen and pasteurized in Houston and brought to Galveston, those opinions in each instance were given upon the assumption that the requisite care was to be taken in the pasteurizing, transporting, and handling of the product. They. all· agreed that each time it was handled.an additional risk arose. The evidence makes clear that all possible safeguards taken in the pasteurization and handling of the·ice cream mix at Houston and in its·transportation to Galveston could possibly be set at naught by the manner in·which it was handled by appellant after he received it. The evidence likewise makes it clear, and all the expert witnesses agree, that any practical measures relative to safeguarding milk and ice cream from infectious bacteria should include proper in-

spections of the premises where it is produced, handled, and pasteurized, and of all persons engaged in handling it. To make that practicable for the appellee city's health department to do, and to insure that the effects of pasteurization should not be endangered by unrestricted handling of the product after it is pasteurized, is what the ordinance plainly is designed to accomplish.

"That being true, it would clearly seem that the ordinance is not one of which there is a clear want of need, or that its unreasonableness so clearly appears that it can by the court be declared an arbitrary measure evidencing an abuse of discretion on the part of the governing body of the city.

"The Supreme Court of Alabama has recently· had before it the case of Gilchrist Drug Company v. City of Birmingham, 234 Ala. 204, 174 So. 609, 111 A.L.R. 103, which is very similar to this one and in which contentions similar to those here made by appellant were there advanced and overruled by the court. * * *

"In Witt v. Klimm, 97 Cal.App. 131, 274 P. 1039, an intermediate appellate court upheld an ordinance of the city of San Francisco, requiring that all milk sold within its borders be pasteurized upon premises in the city, against a plaintiff whose plant was less than two miles from the city limits and which was under the supervision of a milk inspection service approved by the Director of Agriculture of the State. * * *

"In Lang's Creamery, Inc., v. City of Niagara Falls, 224 App.Div. 483, 231 N.Y. S. 368, the Supreme Court of New York upheld a like ordinance of the city of Buffalo, requiring that all pasteurized milk sold within the city be pasteurized at plants in the city, against a plaintiff who maintained his plant at Buffalo, where the milk he wished to sell in Niagara Falls was pasteurized.

"The Court of Appeals affirmed that case (251 N.Y. 343, 167 N.E. 464), on the ground that the plaintiff had not put himself into a position to attack the ordinance, and left the question as to its validity open. * * *

"Second Counter Proposition.

"The ordinance being a reasonable exercise of the powers of the governing body of the city to regulate the handling

and sale of milk and milk products, and applying by its terms to all persons desiring to sell ice cream within the city, creates no unlawful monopoly or discrimination against appellant.

"Authorities: Halsell v. Ferguson, 109 Tex. 144, 202 S.W. 317; 30 Tex.Juris. 120, § 58. * * *

"Argument.

▮▮▮ "The ordinance does not prohibit appellant from conducting his business in the city, but simply deprives him of the privilege of conducting it in the manner he would prefer to. All persons desiring to sell ice cream in the city by the terms of the ordinance are subjected to its requirements, and appellant is placed under no burden not imposed upon all sellers of ice cream in the city. The ordinance consequently makes no discrimination against him, nor does it create a monopoly from which he is excluded. It simply requires of him that which is required of all others engaged in the same business. And if what the ordinance requires of all is a reasonable effort to safeguard the public health, appellant must submit even though his business, as he would like to conduct it, is interfered with. Halsell v. Ferguson, 109 Tex. 144, 202 S.W. 317, 321; 30 Tex. Juris. 120, § 58. In the case cited Mr. Justice Greenwood quoted with approval section 442, Corpus Juris, vol. 12, p. 931: 'Since the very foundation of the police power is control of private interest for the public welfare, a statute or ordinance is not rendered unconstitutional by the mere fact that private rights of person or property are subject to restraint or that loss will result to individuals from its enforcement.'

"This ordinance prohibits no trade. It simply requires in the interest of the public health that ice cream sold within the city be so manufactured, handled, and treated as the governing body in its discretion has concluded it should be, with due regard to the safety of the public health, and that that be done where supervision over it by the city officials is reasonably practicable and can be effectively carried on. If those requirements are reasonable protective measures, then what appellant seeks is not protection from a discrimination, or a monopoly, but special privilege based solely on his purchases from plants outside the city. Clearly, one wishing to bring his product

into the city from an outside plant cannot be said to be discriminated against by an ordinance requiring him to do no more than is required of one having his plant within the city's borders. * * *

"Some of those now engaged in the business might find themselves inconvenienced and have to rearrange their methods of business, but none would be prohibited from freely carrying his product into the city from any other city or place, provided he did with it in the city where sold what the ordinance required him to do there. * * * What health measures the governing body might be empowered to enact with reference to the sale of any given product, or commodity, would obviously depend upon the nature of the product or commodity and the fitness of the measures taken with reference to it. Surely a city is not to be denied the right to take suitable and needed measures to safeguard its people against unsafe milk or ice cream, because of fear that, if allowed to do so, it will commit commercial suicide by taking unwarranted, unneeded, or unreasonable measures with reference to other products.

▮▮▮ "As to appellant's contention that the ordinance is invalid because it imposes undue burdens on interstate commerce, it is sufficient to say that, on long-established and well-known principle, he is not in a position to urge that contention, because he has failed to show that he was or is engaged in interstate commerce, and in fact has shown that he is and was not.

"Third Counter Proposition.

▮▮▮ "The ordinance, being one applying to all persons selling ice cream in the city, is not invalid because its terms do not apply to other and different products, or to other persons engaged in other classes of business.

"Authorities: Miller v. Wilson, 236 U.S. 373, 383, 35 S.Ct. 342, 59 L.Ed. 628, L.R. A.1915F. 829; 30 Tex.Juris. 128, § 61.

"Unpasteurized raw milk is permitted to be sold in appellee city under its ordinances. The health department is required to make inspections of the dairies from which it comes, which are limited to territorial limits of twenty-five miles from the city limits. And the dairies are regularly inspected. The ordinances do not require certificates to be furnished from manufacturers of cheese and butter man-

ufactured outside of the city. And there is no ordinance requiring pasteurization of cream in butter, or cheese, coming from outside sources.

"Argument.

"It would seem to be no concern to appellant that the ordinance does not embrace raw milk, butter, cheese, and other milk products, in which he does not deal and which he has not shown in any way come into competition with or affect his business. No injury to him being shown as resulting from a failure to include the above-mentioned products under the ordinance, it is apparent that it inflicts no discrimination against him. It is shown that the governing body of the city has adopted other measures to safeguard against dangers from raw milk. * * * That other products might have been put into the same class does not itself alone overcome the presumptive validity of the classification the governing-body has made. Miller v. Wilson, 236 U.S. 373, 383, 35 S.Ct. 342, 59 L.Ed. 628, L.R.A.1915F, 829; 30 Tex. Juris. 128, § 61. * * *

"Fourth Counter Proposition.

"Appellant is not in a position to urge that the ordinance delegates arbitrary and excessive authority to the city health officer with reference to approval of pasteurizing apparatus, because appellant has sought no approval of any pasteurizing apparatus to be operated by him, but, on the contrary, is here seeking to compel officers of the city to allow him to conduct his business without any pasteurizing apparatus on his premises.

"Authorities: Ex parte Bogle, 78 Tex. Cr.R. 1, 179 S.W. 1193; City of Graham v. Seal, Tex.Civ.App., 235 S.W. 668.

"Fifth Counter Proposition.

"The only contract of appellant shown to have been affected by the ordinance being one entered into by him after the passage of the ordinance and with knowledge of its existence, clearly appellant has not shown any impairment of the obligation of any contract by the ordinance."

These conclusions require an affirmance of the trial court's judgment; it will be so ordered.

Affirmed.

PLEASANTS, C. J., absent.