[Civ. No. 20548. First Dist., Div. Two. Jan. 21, 1963.]

JOHN A. O'KANE, as Superintendent of Banks, Plaintiff and Appellant, v. JAIME V. CATUIRA et al., Defendants and Respondents.

[Civ. No. 20549. First Dist., Div. Two. Jan. 21, 1963.]

JOHN A. O'KANE, as Superintendent of Banks, Plaintiff and Appellant, v. RUBIN MENDOZA, Defendant and Respondent.

[Civ. No. 20550. First Dist., Div. Two. Jan. 21, 1963.]

JOHN A. O'KANE, as Superintendent of Banks, Plaintiff and Appellant, v. N. N. MORABE, Defendant and Respondent.

(Consolidated Cases.)

Stanley Mosk, Attorney General, and Victor Griffith, Deputy Attorney General, for Plaintiff and Appellant.

Marcel E. Cerf, Robinson & Leland, Dalton & Bautista, Clyde B. Dalton and Harold C. Brown for Defendants and Respondents.

SHOEMAKER, J.—Plaintiff Superintendent of Banks appeals from judgments rendered in three consolidated actions refusing to enjoin defendants from engaging in the business of transmitting moneys from the United States to the Philippines.

In 1960, plaintiff commenced three separate actions for injunctions under Financial Code, section 3395, against defendants Jaime Catuira and Catuira and Associates, Inc.; against defendant Rubin Mendoza, an individual doing business under the fictitious name of Sonomatic Philippines; and against defendant N. N. Morabe, an individual doing business under the fictitious name of N. N. Morabe and Co. In each case, plaintiff alleged that the defendant or defendants named were engaged in the business of receiving money within the State of California for the purpose of transmitting the same or its equivalent to a foreign country without first having obtained a license pursuant to Financial Code, section 1801. Plaintiff asked that each of the defendants be restrained from continuing to engage in this practice without first obtaining the required license. Defendants' sole defense was that sections 1800 and 1801 of the Financial Code were unconstitutional.

The undisputed facts show that Jaime Catuira is the presi-

dent of Catuira and Associates, Inc., an incorporated travel agency. The corporation maintains offices in California and the Philippines. In conjunction with its travel business, the corporation sells Philippine pesos to persons traveling to the Philippines and delivers them at time of arrival therein. The corporation also forwards money from the United States to people in the Philippines. The customary procedure is for the corporation to receive American dollars within California from a customer desiring to transmit an equivalent amount of pesos to a specified person in the Philippines. The corporation deposits the money to the California bank account of a Chinese bank with which it has arranged to make the purchase of pesos. The Chinese bank then sees that an equivalent amount of pesos is paid the Philippine branch of the corporation, which, after deducting its charges, pays the pesos to the designated payee in accordance with instructions from the corporation's California office.

Rubin Mendoza, a Philippine citizen, maintains an office in California and in the Philippines for the purpose of exporting appliances and engaging in the foreign exchange business. His customers give him dollars in California and indicate the person to receive an equivalent amount of pesos in the Philippines. The customer is instructed to send his receipt to the payee, who may then obtain the pesos from Mendoza's Philippine office. Mendoza uses the dollars received in California for the purchase of appliances which he sells for pesos in the Philippines. He then uses the pesos derived from these sales to pay the payee designated on his receipts. Mendoza also buys pesos from private persons and from Chinese banks by depositing dollars to their accounts in California banks.

N. N. Morabe maintains offices in California and in the Philippines. Although Morabe's main business is export and import, he also engages in the money exchange business. Morabe receives dollars from customers in California and has them fill out an application giving the name and address of the payee in the Philippines. Morabe then notifies his Philippine office of the name of the payee and the amount of pesos he is to receive. Morabe obtains his pesos from several sources. One source is the Philippine citizen who desires to travel in the United States and delivers pesos to Morabe's Philippine office in exchange for dollars in the United States. Morabe's export-import business is another source of pesos. In addition, Morabe purchases pesos from Chinese banks by deposting dollars to

their California accounts in the same manner as Catuira and Mendoza.

After trial, the court found that all of the defendants were engaged in the business of receiving money within the state for the purpose of transmitting the same to a foreign country. It further found that none of the defendants had obtained a license pursuant to Financial Code, section 1801. The court concluded, however, that Financial Code, sections 1800 and 1801, violated the equal protection clause of the Fourteenth Amendment to the federal Constitution and were also invalid under article I, section 21, and article IV, section 25, of the California Constitution.[1] Accordingly, plaintiff was denied an injunction in each of the three consolidated actions, and judgments were so entered in favor of all defendants.

The sole question raised by this appeal is whether the trial court was correct in holding these code sections unconstitutional. The sections we are concerned with provide as follows: Financial Code, section 1800: ''No person except (a) a bank or trust company or a foreign banking corporation licensed to do business in this State, or (b) an incorporated railroad, steamship, or express company, or (c) a partnership, corporation, or joint stock company or association actually engaged in international operation in the general travel and tourist business, shall engage in the business of receiving money for the purpose of transmitting the same or its equivalent to foreign countries. . . . The provisions of this article shall not apply to the receipt of money by an agent of an incorporated telegraph company at any regular office of such company for immediate transmission by telegraph.''

Financial Code, section 1801: ''Every railroad, steamship, or express company, and every partnership, corporation, or joint stock company or association engaging in the business or businesses described in Section 1800 shall first obtain the license from the superintendent and shall pay annually on or before July 1st a license fee of two hundred fifty dollars

---

[1]Article I, section 21, provides: ''No special privileges or immunities shall ever be granted which may not be altered, revoked, or repealed by the Legislature; nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens.''

Article IV, section 25, provides: ''The Legislature shall not pass local or special laws in any of the following enumerated cases . . . Nineteenth—Granting to any corporation, association, or individual any special or exclusive right, privilege, or immunity. . . . Thirty-third—In all other cases where a general law can be made applicable.''

($250). The superintendent in his discretion may grant or refuse such license and may at any time revoke any such license. For the purposes of this article, 'qualified company' means any company, partnership, corporation, or joint stock company or association licensed pursuant to this section.''

Successive sections of the Financial Code require ''qualified companies'' to file semi-annual reports with appellant Superintendent of Banks (Fin. Code, § 1802), and to file a verified annual report (Fin. Code, § 1803); also empower the superintendent to examine the business of any agent and ascertain whether such business is being conducted in a lawful manner and whether all moneys received for transmission are properly accounted for (Fin. Code, § 1804). In addition, each qualified company must deposit $50,000 in money or securities with the State Treasurer as security for the faithful performance of its obligations, or, in lieu thereof, must post a surety bond in that sum with the superintendent (Fin. Code, §§ 1807-1808). Any person, other than an authorized officer or employee of a bank, trust company, or foreign banking corporation licensed to do business in the state or an agent of a qualified company, who solicits or receives money for transmission, is guilty of a misdemeanor (Fin. Code, § 1810).

These sections present a comprehensive legislative scheme, the basic purpose of which is to protect the public by restricting and licensing those persons who handle its money. It is apparent that the Legislature, pursuant to sections 1800 and 1801, has undertaken to distinguish between (1) those entities which may receive and transmit money to foreign countries without the necessity of complying with the licensing and other requirements summarized above; (2) those entities which may receive and transmit money only after full compliance with the licensing and other requirements; and (3) those individuals and entities who may not, under any circumstances, engage in the business of receiving and transmitting money to foreign countries. Thus, a bank or trust company, a foreign banking corporation licensed to do business in this state, or an incorporated telegraph company transmitting money by telegraph, may engage in the business of receiving and transmitting money to foreign countries without obtaining a license, depositing money or other security, filing reports, or submitting to examinations by the superintendent. Incorporated railroads, steamship and express companies, and partnerships, corporations, joint stock companies, and associations ''actually engaged in international operation in the general travel and

tourist business" may receive and transmit money only after full compliance with sections 1800 et seq. Individuals, regardless of what business they may conduct, and corporations or other business entities which are not banking, railroad, steamship, telegraph, or express companies, and which are not actually engaged in the international travel and tourist business, may under no circumstances engage in the business of receiving and transmitting money to foreign countries.

In resolving this question, we are governed by several well settled principles in the law. ■■■ "[T]he test for determining the validity of a statute where a claim is made that it unlawfully discriminates against any class is substantially the same under the state prohibitions against special legislation and the equal protection clause of the federal Constitution." (*County of Los Angeles* v. *Southern Cal. Tel. Co.* (1948) 32 Cal.2d 378, 389 [196 P.2d 773].) In either case, a statute cannot be deemed in conflict with the constitutional provisions unless the discrimination or inequality produced by the particular legislative classification is " 'actually and palpably unreasonable and arbitrary.' " (*People* v. *Western Fruit Growers, Inc.* (1943) 22 Cal.2d 494, 506 [140 P.2d 13].)

■■■ " 'When a legislative classification is questioned, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of existence of that state of facts, and the burden of showing arbitrary action rests upon the one who assails the classification.' " (*Blumenthal* v. *Board of Medical Examiners* (1962) 57 Cal.2d 228, 233 [18 Cal.Rptr. 501, 368 P.2d 101].)

■■■ It is also the rule, however, that a discrimination which bears no reasonable relation to a proper legislative objective is invalid. (*Accounting Corp.* v. *State Board of Accountancy* (1949) 34 Cal.2d 186, 190 [208 P.2d 984]; *Blumenthal* v. *Board of Medical Examiners, supra,* at p. 233.)

■■■ A legislative classification which is purely arbitrary and capricious and based upon no reasonable or substantial difference between the classes is clearly unconstitutional. (*Del Mar Canning Co.* v. *Payne* (1946) 29 Cal.2d 380, 382-383 [175 P.2d 231].)

■■■ In the instant case, the trial court, in holding Financial Code, sections 1800 and 1801, unconstitutional, found that "there is no peculiarity in the condition of those engaged in the business of dealing in receiving money for the purpose of transmitting moneys to foreign countries" which justifies limiting of the issuance of a license to certain designated com-

panies and prohibiting all individuals and all other companies from engaging in this business. We agree.

In *Wedesweiler* v. *Brundage* (1921) 297 Ill. 228 [130 N.E. 520], more than 50 complainants engaged in the business of transmitting money to foreign countries and of buying and selling foreign money within the state sought an injunction against the threatened enforcement of an Illinois act regulating the banking industry. Section 15½ of the act provided that no natural person or persons, firm or partnership (other than a bank) could transact the business of transmitting money to foreign countries or buying and selling foreign money "provided that express, steamship and telegraph companies may continue their business of transmitting money and receiving money to be transmitted . . ." (p. 521 of 130 N.E.). The Illinois Supreme Court held this proviso unconstitutional, stating: "No reasonable distinction exists for this proviso. It declares, in effect, that incorporated banks, and express, steamship, and telegraph companies, whether incorporated or not, may engage in the business of transmitting money to foreign countries, but no other natural person, firm, or partnership may. So far as incorporated banks are concerned, the reason for the distinction is apparent. As between natural persons and partnerships on the one hand, and express, steamship, and telegraph companies on the other, the distinction is not based upon any just reason. It has no reference to character, solvency, financial resonsibility, security, business, or monetary facilities, incorporation, method of doing business, public inspection, supervision, or report, or any other thing having any relation to the protection of the public from loss by reason of the dishonesty, incompetence, ignorance, or irresponsibility of persons engaging in that business." (P. 523 of 130 N.E.) The court went on to point out that two men associated as partners and desiring to engage in the business of transmitting money to foreign countries need only operate an express, steamship, or telegraph company in order to be qualified under the act. Under such circumstances, the classification was an arbitrary one providing no real protection for the public and accordingly violated the due process and equal protection clauses of the federal and state Constitutions.[2]

---

[2] It may be noted that in *Commercial Banking Corp.* v. *Freeman* (1946) 353 Pa. 563 [46 A.2d 233], the Pennsylvania Supreme Court upheld as valid a classification identical to that involved in the *Wedesweiler* case. The court in the *Commercial* case, however, analyzed the statute in an entirely different manner and does not appear to have considered the arguments which the *Wedesweiler* court found persuasive. It may also

In *State* inf. *Taylor* v. *Currency Services, Inc.* (1949) 358 Mo. 983 [218 S.W.2d 600], the Missouri Supreme Court held unconstitutional a state statute which provided that no corporation, other than one formed under or subject to state or federal banking laws or an express company having express service contracts with railroads, transatlantic steamship, telegraph, or telephone companies, could receive money for transmission or transmit the same, by traveler's check, money order, or otherwise. The court held the statute to be in violation of a section of the state Constitution prohibiting local or special laws granting any special or exclusive right, privilege or immunity to any corporation, association or individual. The court pointed out that a law which is made applicable to a particular class must bear equally upon all persons coming naturally within the class. If express companies were to be granted the privilege of receiving money for transmission, the Legislature was required to extend this privilege to all other corporations falling naturally within the same group, such as steamship or airplane companies operating in interstate or intrastate trade or across oceans other than the Atlantic, bus and truck companies, and companies operating armed and armoured cars for the transmission of payrolls. Since there was no valid basis for favoring express companies alone, the statute was unconstitutional.

In *Morey* v. *Doud* (1957) 354 U.S. 457 [77 S. Ct. 1344, 1 L.Ed.2d 1485], the United States Supreme Court held unconstitutional an Illinois statute which excepted the American Express Company from the requirement that any firm selling money orders must secure a license and submit to state regulation. The court concluded that the statutory exception violated the equal protection clause because it bore no reasonable relation to the purpose of the legislation.

Respondents correctly point out that the Financial Code, sections 1800 and 1801, permit a "partnership, corporation, or joint stock company or association" in the general travel and tourist business to apply for a license to transmit money to foreign countries. An individual engaged in the same business, however, is prohibited from doing so. We are of the opinion that this distinction is an arbitrary one, which

be noted that in *Morey* v. *Doud* (1957) 354 U.S. 457, 469 [77 S.Ct. 1344, 1 L.Ed.2d 1485] (discussed *infra*), the United States Supreme Court quoted with approval from the *Wedesweiler* case, and made no mention of the *Commercial* case.

bears no relation to the purpose of the legislation. Appellant himself is able to point to no single reason why members of the public are better protected against loss when dealing with a two-man partnership engaged in the international travel and tourist business than with an individual operating a similar business. If it be assumed that both the individual and the partnership are willing to post the required $50,000 bond and are also willing to comply with the other applicable regulations, it is impossible to see why the public is in any way protected by licensing one and prohibiting the other, regardless of his character and financial stability, from engaging in the business of transmitting money to foreign countries. Had the statutes undertaken to distinguish between corporations and all other business entities and individuals, such a classification could more readily be justified. In *County of Los Angeles* v. *Southern Cal. Tel. Co., supra,* at pp. 390-391, the court stated that there was a reasonable basis for treating corporations as a separate class, since they are more easily regulated and supervised, have much greater permanency of existence, and can thus give better assurance of uninterrupted service. This reasoning is clearly not applicable, however, to a partnership or to a joint stock company or association, and it is apparent that the attempt to classify these entities separately from individuals engaging in the same business is both unreasonable and arbitrary.

Respondents also contend, with equal merit, that the legislative distinction between those companies engaged in the international travel and tourist business and those companies operating in other fields has little connection with the need to protect the public from financial irresponsibility or dishonesty. Although it would seem probable that a corporation dealing *exclusively* in the business of transmitting money to foreign countries would provide the greatest protection for the public, sections 1800 and 1801 prohibit any such company from applying for a license. Similarly, companies which operate export-import businesses but which do not deal directly with the "travel and tourist" business may not apply. Here again, the Legislature appears to have imposed an arbitrary and capricious classification which extends a privilege to certain specified businesses while refusing it to others of like qualifications.

Since sections 1800 and 1801 are clearly invalid for the reasons above noted, it is unnecessary to subject them to further analysis. ██ There can be no doubt that the trial

court was correct in holding that the statutes were special legislation in violation of the California Constitution and the equal protection clause of the federal Constitution.

Appellant points out, however, that section 19 of the Financial Code contains a severability clause. It is his contention that this court may sever the invalid portions of the statutes from the valid portions without destroying the statutory scheme and the utility of the remaining provisions. He proposes, more specifically, that all reference to the licensing of partnerships, corporations, or joint stock companies or associations engaged in the international travel and tourist business, be stricken from both sections. According to appellant, the remaining portions of the statutes will then accomplish the dominant legislative purpose and will prohibit the issuance of a license to any individual or entity other than banking, railroad, steamship, express, and telegraph companies. This argument is wholly without merit. The rule is well established that a general provision which is unconstitutional cannot be given effect in part if the result of giving it such partial effect would be to accomplish a purpose which the lawmaking power never intended or where the legislative intent is doubtful. (*Robert* v. *Police Court* (1905) 148 Cal. 131, 135 [82 P. 838].) An unconstitutional enactment will be upheld in part only if it can be said that that part is complete in itself and would have been adopted by the Legislature had the latter foreseen the partial invalidation of the statute. (*Looff* v. *City of Long Beach* (1957) 153 Cal.App.2d 174, 186 [314 P.2d 518].) In our view, it is impossible to say whether the Legislature, had it foreseen the invalidity of sections 1800 and 1801, would have chosen to eliminate all reference to the "travel and tourist" category or would have chosen to broaden that category in such a manner as to make it applicable to other businesses and to individuals as well as corporations, partnerships, and joint stock companies. Under such circumstances, the trial court was clearly correct in holding Financial Code, sections 1800 and 1801, void in their entirety.

Judgments affirmed.

Kaufman, P. J., and Agee, J., concurred.

A petition for a rehearing was denied February 5, 1963, in each of the consolidated cases and appellant's petition for a hearing by the Supreme Court was denied March 20, 1963.