[Civ. No. 30980. Second Dist., Div. One. Mar. 3, 1967.]

MAGAN MEDICAL CLINIC et al., Plaintiffs and Appellants, v. CALIFORNIA STATE BOARD OF MEDICAL EXAMINERS, Defendant and Appellant.

Musick, Peeler & Garrett, James E. Ludlam and Bruce A. Bevan, Jr. for Plaintiffs and Appellants.

Thomas C. Lynch, Attorney General, and John M. Huntington, Deputy Attorney General, for Defendant and Appellant.

FOURT, J.—This is an appeal which involves the interpretation of section 654 and other sections of the Business and Professions Code with reference to doctor-owned pharmacies.

In a declaratory relief action brought against the California State Board of Medical Examiners, sometimes hereinafter referred to as Board, filed in Los Angeles County on May 18, 1965, Magan Medical Clinic and its nine partners, Rees-Stealy Medical Clinic and its 20 partners, Santa Barbara Medical Clinic and its 19 partners sought a declaration from the court

that section 654, Business and Professions Code, does not require a divesting of interests which they hold in certain pharmacies. The facts are not in dispute and are sufficiently set forth in the findings which, in part, are as follows: Magan Medical Clinic is a medical group partnership in Covina, California, holding a permit issued by the Board pursuant to section 2393, Business and Professions Code. Nine named plaintiffs are members of the partnership and are physicians and surgeons, licensed by the Board under division 2, chapter 5 of the Business and Professions Code. The Clinic Pharmacy holding a permit issued by the California State Board of Pharmacy is a pharmacy operated in Covina, California, in conjunction with and as a part of the Magan Medical Clinic. The pharmacy is owned and conducted by a partnership entitled The Clinic Pharmacy, the members of which partnership are the members of the Magan Medical Clinic and two retired members of the latter.

Rees-Stealy Medical Clinic is a medical group partnership in San Diego, California, holding a permit issued by the Board pursuant to section 2393, Business and Professions Code. Twenty named plaintiffs are members of that partnership and are physicians and surgeons licensed by the Board under division 2, chapter 5 of the Business and Professions Code. The Rees-Stealy Clinic Pharmacy, holding a permit issued by the California State Board of Pharmacy, is a pharmacy operated in San Diego, California, in conjunction with and as a part of the Rees-Stealy Medical Clinic. The pharmacy is owned and conducted by a partnership, the members of which partnership are the members of the Rees-Stealy Medical Clinic with the exception of four of such members.

Santa Barbara Medical Clinic is a medical group partnership in Santa Barbara, California, holding a permit issued by the Board pursuant to section 2393 of the Business and Professions Code. Fourteen named plaintiffs are members of that partnership and are physicians and surgeons licensed by the Board under division 2, chapter 5 of the Business and Professions Code. The Santa Barbara Medical Clinic Prescription Pharmacy, Inc., is a California corporation; the sole shareholder and owner of the stock is the Santa Barbara Medical Clinic, the medical group partnership. The director and officers of said corporation are, and each is, a plaintiff and a member of the medical group partnership. The Santa Barbara Medical Clinic Prescription Pharmacy, Inc., holds a permit

issued by the California State Board of Pharmacy and owns and conducts a pharmacy in Santa Barbara in conjunction with and as part of the Santa Barbara Medical Clinic.

Five other named plaintiffs (who are physicians and surgeons) own stock in publicly owned corporations (such as Thrifty Drug Stores, Inc., and Walgreen Co.) which operate pharmacies in California pursuant to permits issued by the California State Board of Pharmacy.

The power to revoke or suspend a permit issued to a medical clinic or group is lodged with the Board.

In 1963, Statutes 1963, chapter 1303, section 1 was enacted which amended Business and Professions Code section 654 by adding thereto the following language.

". . . Nor, after June 1, 1967, shall any person licensed under Chapter 5 of this division have any membership, proprietary interest, or co-ownership in any form in or with a pharmacy regulated by Chapter 9 (commencing with Section 4000) of this code, except that this shall not apply to a hospital pharmacy nor prohibit ownership in the building in which a pharmacy is located.

" 'Proprietary interest' does not include ownership of a building where space is leased to a pharmacy at the prevailing rate, either under a straight lease or a percentage of the gross income of the pharmacy."

Business and Professions Code, section 2393, subdivision (b), provides that a permit may not be issued to a clinic or group unless ''The place or establishment, or the portion thereof, in which the applicant or applicants practice, is owned or leased by the applicant or applicants, and the practice conducted at such place or establishment, or portion thereof, is wholly owned and entirely controlled by the applicant or applicants.''

Plaintiffs' clinics have complied with section 2393, subdivision (b). The respective pharmacies owned and operated in conjunction with the clinics constitute part of the medical facilities made available to the public at the clinics. The plaintiffs filed a petition with the Board seeking a declaration of the construction and validity of said amendment by the Board and said Board declined to file the petition and refused to hold a hearing thereon.

The court held and adjudged that: (1) Section 654 *is* applicable to a state of facts in which medical clinic and medical group partnerships, operating pursuant to section 2393, own

and conduct pharmacies regulated under chapter 9; in other words, that the act does apply to a partnership of physicians and surgeons owning a pharmacy. (2) Section 654 is *not* applicable to a state of facts in which medical clinic or medical group partnerships, operating pursuant to section 2393, own stock in corporations which own and conduct such pharmacies; in other words, that the act does not apply to a partnership of physicians and surgeons which owns all of the stock in a corporation which owns a pharmacy. (3) Section 654 is *not* applicable to a state of facts in which persons licensed under chapter 5 of said code own stock in corporations which own and conduct such pharmacies, if the stock is traded among the public, and (4) Section 654 as so construed is not unconstitutional.

Plaintiffs have appealed from that part of the judgment numbered herein as 1 and 4. The Board has cross-appealed from that part of the judgment numbered herein as 2 and 3.

In our opinion, section 654 is constitutional. ▮▮ A statute is presumed to be constitutional and the burden in this case is on the plaintiffs to establish clearly that it is unconstitutional. If there is a state of facts which can reasonably be conceived that would sustain the statute, there is a presumption of the existence of such state of facts, and the burden of showing arbitrariness is upon the party so claiming. (*Board of Education* v. *Watson,* 63 Cal.2d 829, 833 [48 Cal.Rptr. 481, 409 P.2d 481].)

Plaintiffs assert that the law singles out physicians as being the only persons ineligible to obtain a pharmacy permit, that it is arbitrary and capricious, that no evil is eliminated by the statute, that the statute bears no necessary relation to the supposed evil and that the Legislature made no effort in the first instance to attempt to regulate any evil practices but flatly prohibited pharmacy ownership by all physicians. Plaintiffs suggest that the statute was sponsored by various pharmacy associations and that it was claimed that some physicians gouged their patients through their pharmacy connections.

It would seem that the problem between the physicians and pharmacists is not new. For several centuries business relationships between physicians and pharmacists have been forbidden. The prohibition is apparently in recognition of the fact that, where the professional practice of an individual may have an influence on the economic success of a proprie-

tary venture, the best interest of the patient may not be the primary factor in selecting either the medication prescribed or dispensed. The Genoa Legal Code of 1407 stated: ''We fix and ordain—to prevent any pharmacist from having temptation or reason for sinning, and to keep prices from being raised higher than is becoming—that no pharmacist may keep shop in partnership or agreement with any physician. All pharmacists must swear an oath before the masters of the craft, each year, to observe completely and precisely the letter and spirit of this prohibition.'' (See page 188, Hearings before the Subcommittee on Anti-trust and Monopoly of the Committee on the Judiciary, United States Senate, 88th Congress, 1964.)

The problem, in any event, came to the attention of the California Legislature and it acted. Perhaps it came to the attention of the Legislature through the hearings of the subcommittee of the Judiciary Committee of the United States Senate where, among other things, it was developed that physicians in California owned 39 pharmacies in 1949, 213 in 1962 and that between February 1962, and February 1963, an additional 39 such pharmacies were registered with the State Pharmacy Board which, to say the least, indicated a trend.[1] However, whether the doctors are at the start of a

---

[1] ''. . . These figures are minimums because they include only those persons who identified themselves as doctors on the pharmacy applications.

'' . . . . . . . . . . .

''Testimony before the California State Board of Pharmacy and the California State Legislature about these physician-owned pharmacies tell the story vividly. This testimony spells out the problems created through such ownerships.

''1. Charles Markley of the Contra Costa County Welfare Department testified that a doctor in his county was writing prescriptions for indigent welfare patients at the rate of about $10,000 a year until he opened a pharmacy next to his office in 1960. In the next 12 months, said the welfare official, the doctor's prescription business under the welfare program soared to $50,000 without a corresponding increase in the number of patients he treated.

''The doctor disappeared shortly before he was indicted by a grand jury on charges of making false claims and receiving payment for medical treatment to welfare patients allegedly never actually treated.

''2. A Canoga Park pharmacist testified that the doctors who owned a pharmacy in a Beverly Hills clinic asked him to manage the business for $15,000 a year, plus 2 percent to 3 percent of the gross profits. The pharmacist described this proposition as far more lucrative than normal arrangements.

''The witness claimed the doctors told him they could afford to make him this offer because they could write more and bigger prescriptions than their patients needed. According to the pharmacist, the doctor ex-

campaign to secure to doctors all of the lucrative prescription-filling business by getting into that business and ultimately discouraging or eliminating the independent druggist-

plained they could steer their patients to him, guaranteeing the increased business.

"3. A Los Angeles pharmacist reported that the pharmacy in a private Los Angeles hospital, owned by the same doctors who owned the hospital netted a $90,000 profit in 1961 on a $10,000 inventory.

"Such large profits could only be made by using a formulary drug system which limits the physician's choice to usually one drug in each therapeutic classification of medications.

"4. As recent as May 1963, another southern California group of doctors sought a pharmacist to lease their pharmacy for $600 a month. The store which is attached to a private hospital would provide drugs to hospital patients. The pharmacist would be required to bill the hospital, which would in turn bill the hospital patients. The doctor-owned hospital would retain 60 percent of the drug charges and pay the remaining charges to the pharmacy.

"5. An Arroyo Grande clinic owned by a group of physicians controlled an adjacent pharmacy. A lady undergoing treatment in the clinic was given nine prescriptions and told to have them filled at the clinic pharmacy. When she informed the physician that she was employed in a local pharmacy and preferred to have her prescriptions filled in the other pharmacy, she was told to have only three of the prescriptions filled— that she didn't need the other six prescriptions.

"For 17 years, our California Pharmaceutical Association discussed this problem with our counterparts in the California Medical Association. We were getting nowhere in our discussions. We needed a solution, for the problem was getting out of hand. Every year there were more and more M.D.-owned pharmacies in the State.

"Consequently, the California Pharmaceutical Association in 1962 requested the California State Board of Pharmacy to adopt rules and regulations setting forth standards of professional conduct for pharmacists in their dealings with the public and members of other health professions. An enabling act, passed by the 1959 session of the California State Legislature and signed by the Governor permits the pharmacy board to adopt such regulations." (Hearings before the Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary, United States Senate, 88th Congress, 1964—p. 163.)

"In addition to a captive market, the doctor-owned pharmacy has other economic advantages over the independent drugstore. The independent retail druggists' profit margin on prescription drugs is normally 40 percent of the retail price. This is a modest way of saying that his markup is roughly 66 percent of the wholesale price. However, he must stock some drugs in an assortment of brand names because he must be able to fill prescriptions with the different brands designated by different physicians. For example, in writing a prescription for reserpine, an important hypotensive drug, one doctor may designate Serpasil, another Rau-Sed, still another Reserpoid. Or in the case of one of the newer synthetic penicillins, doctors may prescribe the same drug under the names of Chemipen, Darcil, Maxipen, Syncillin, or Ro-Cillin. Each must be stocked by the retail druggist, for he is forbidden by law to fill a prescription with a different brand name—even if the drug is the same.

"Here is where the doctor-owned pharmacy has a real cost advantage over the independent druggist. The doctor members of the 'clinic' can settle upon a single brand, eliminating the need for their pharmacy to

merchant from entering into the business is not the present concern of this court.

Other states have statutes with reference to the subject matter.[2] ▮ The state clearly has the power to regulate professions in the interest of public health, safety and welfare. The police power is the broadest in scope of any field of government authority and is the " 'power to prevent, an anticipation of danger to come . . . and restrain the individual tendency.' " (*Gilchrist Drug Co.* v. *City of Birmingham*, 234 Ala. 204 [174 So. 609, 612, 111 A.L.R. 103]; *Mannix* v. *Frost*, 100 Misc. 36 [164 N.Y.Supp. 1050, 1057]; *Barsky* v. *Board of Regents*, 347 U.S. 442, 449 [98 L.Ed. 829, 74 S.Ct. 650].) There must, of necessity, be a very great discretion vested in the Legislature to the end that changing needs and conditions can be met.

This court should not be concerned with the wisdom, or the lack of it, the policy or necessity for such an enactment. Judges have no special competence to determine the wisdom

carry several items whose only difference is the brand name. Moreover, if the particular drug is not controlled by patents, it can be purchased under its low-priced generic name, prescribed generically, and sold at the higher prices of the major company brands.

"Another interesting area is the inflationary effect of doctor-ownership on welfare costs. To a physician owning no interest in a drugstore, his only compensation for treating a welfare patient is the fee paid by the welfare department. But to the doctor-owner there is more, the income he receives from the sale of drugs which he has prescribed. The more he prescribes for his welfare patient the greater will be his income. . . .

" . . . . . . . . . .

"It has been my experience that doctors, regardless of what reasons they give, own pharmacies for one reason—money. It is a made-to-order investment with guaranteed dividends. They are not confronted with normal competitive dangers other retail drugstores encounter, not when the doctor or doctors who own the pharmacy wield the pen that writes the prescriptions.

"It is not necessary for the doctors to coerce patients to patronize their pharmacies; they need only suggest. In many instances, the physician, without consulting the patient, phones the prescription to his pharmacy. A not too uncommon practice is where the physician tells the patient the medication he has prescribed is not stocked by other drugstores and can be obtained only at one pharmacy—his pharmacy. How can the patient be expected to know otherwise?" (Physician-Ownership in Pharmacies and Drug Companies—Report of the Subcommittee . . . to the Committee on the Judiciary, United States Senate, pages 26 *et seq.*)

In the report above cited the names of the doctors involved, the communities where they practiced, the approximate amounts involved and other pertinent data is set forth with particularity.

[2]Md. Ann. Code art. 43, § 266A(c)(4)(iii) (Supp. 1964), N.D. Cent. Code 43-15-35(5) (Supp. 1965) Pa. Stat. Ann. tit. 63, § 390-5(9) (Supp. 1964), Mich. Stat. Ann. § 14.771 (1956).

or lack of such in the adoption of a statute. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it. (*Williamson* v. *Lee Optical of Okla.*, 348 U.S. 483, 488 [99 L.Ed. 563, 75 S.Ct. 461].) To demonstrate that the law is unconstitutional, the plaintiffs must in effect show that no basis in fact for the law exists and that the Legislature could not in good faith believe that such a need exists.

Reports of the committees of the United States Congress seem to indicate that in some instances when a doctor buys a pharmacy whose business he can affect by his own prescription writing, a conflict of interest develops. The conflict might well develop between the duty owed to the patient and the doctor's desire to make a profit out of the pharmacy. It has been stated that the doctor who has a financial interest in where his prescriptions are filled may be tempted to prescribe unnecessary medicine, or to prescribe a drug which yields a greater margin of profit or to keep a patient on drugs for an unnecessary period of time. Certainly a sick patient deserves to be free of any reasonable suspicion that his doctor's judgment is influenced by a profit motive.

In the United States Senate committee hearings pharmacists made some ugly charges in effect that some physicians engaged in some nefarious practices, prescribed unsuitably, overprescribed, overcharged and foreclosed the patient's freedom of choice when such physicians owned pharmacies. It was stated that some doctors wrote prescriptions in code, to the end that the patient had to go to that doctor's pharmacy to have his prescription filled, that some doctors telephoned their prescription directly to their own drug stores, some prescribed dosage forms of brands stocked only in their stores, and in some instances printed the name of their pharmacy on the prescription.[3]

Prior to 1954 the American Medical Association's principles dictated that physicians should recognize and promote the practice of pharmacy as a profession and that ''An ethical physician does not engage in barter or trade in the appliances, devices, or remedies prescribed for patients, but limits the source of his professional income to professional services rendered to the patient.''

The judicial council of the American Medical Association in

[3]See 41 Notre Dame Lawyer 49.

1960 ruled: "The rental of space by a physician or group of physicians as a pharmacy should be a fixed one. Were the rental to be based on the amount of business, *it might well be argued, and indeed be the case, that fee splitting existed.* In addition, the temptation would be ever present for the doctor-owner to encourage patients to take their prescriptions to that pharmacy. *The evils inherent in such practice are too obvious to be mentioned.*"

In other words, it is unethical for a physician to share in a percentage of the profits of a pharmacy, when such profits assume the form of rent for reasons "too obvious to mention" yet according to plaintiffs' and apparently according to present American Medical Association principles, a physician may own an entire pharmacy and take all of the profits without violating any ethical standards.

It is fairly obvious that the sick patient is caught in between the alleged warring factions. The doctor is in most instances the only person who can prescribe certain medicines. To a certain extent the pharmacist has a monopoly over the prescription business by reason of his license to practice. Ethical drugs may be purchased only with a doctor's prescription and only a registered pharmacist may fill that prescription. The doctor dictates what brand the patient is to buy and the pharmacist is forbidden by law to substitute a different brand, even though it may be equal in quality and cheaper in price. The doctor orders the amount of drugs and prescribes the quantity to be consumed. In other words, the patient is a captive consumer. There is no other profession or business where a member thereof can dictate to a consumer what brand he must buy, what amount he must buy, and how fast he must consume it and how much he must pay with the further condition to the consumer that any failure to fully comply must be at the risk of his own health. If the doctor interferes with the patient's free choice as to where he purchases his prescribed medicine, the patient then becomes a totally captive consumer and the doctor has a complete monopoly.

Plaintiffs place considerable reliance in the holding in *Louis K. Liggett Co.* v. *Baldridge,* 278 U.S. 105 [73 L.Ed. 204, 49 S.Ct. 57] where the court invalidated a Pennsylvania statute as violative of the equal protection and due process clauses of the Constitution, holding that the mere ownership of a drug store "can have no real or substantial relation to the public health; . . ." (P. 113.) Justices Holmes and

Brandeis dissented. There can be no doubt that the rule is now different and as said in *Brooks* v. *State Board of Funeral Directors & Embalmers,* 233 Md. 98 [195 A.2d 728, 735], "It [the *Liggett* case] has been seriously limited, if not completely undermined." (See also *Daniel* v. *Family Security Life Ins. Co.,* 336 U.S. 220 [93 L.Ed. 632, 69 S.Ct. 550, 10 A.L.R.2d 945] ; *Ferguson* v. *Skrupa,* 372 U.S. 726 [10 L.Ed. 2d 93, 83 S.Ct. 1028, 95 A.L.R.2d 1347].)

 Our law in question prohibits the pharmacy board from issuing new pharmacy permits to physicians and requires all physicians to rid themselves of any "membership, proprietary interest, or co-ownership" by June 1st, 1967. The law does not prevent other nonpharmacists from owning an interest in a pharmacy; nor does it prevent a doctor from leasing space in his building to a pharmacist, either under a straight rent or a percentage of the income.

The question is, is it in the public welfare to prohibit a physician who prescribes medicines from having an interest in an establishment which fills prescriptions? We think it was reasonable for the Legislature to declare, in effect, that such a statute would be for the public welfare. True it is that the statute may leave much to be desired. The question is a debatable one upon which reasonable men may differ, and under such circumstances, it is not the duty or the province of this court to substitute its judgment for that of the Legislature. The court can interfere only when the statute clearly interferes with the Constitution. The law need not be in every respect logically consistent with its aims to be constitutional.

 Considering next the contention of the plaintiffs with reference to physician-partnership pharmacies: a partner is by statute a co-owner with his partners of specific partnership property holding as a tenant in partnership. (Corp. Code, § 15025, subd. 1.) If a partnership is incorporated and its assets transferred to a corporation, the rules applicable to the nature of the ownership of partnership assets will generally cease. (*Donroy, Ltd.* v. *United States,* 196 F.Supp. 54; *Estate of Duncan,* 9 Cal.2d 207 [70 P.2d 174].) The nature of a partner's interest in a partnership is very different than the interest of a stockholder in a corporation.

In other words, as plaintiffs state: "[T]he general rule is that a partnership is not a separate entity from its partners and thus partners, as contrasted with shareholders in a corporation, do have an interest in partnership property." Plaintiffs then assert that the rule should not prevail in this case,

that an exception should be made and here each partnership should be considered as an entity for the purposes of this particular statute. This theory is largely premised upon the idea that section 4080.5[4] of the Business and Professions Code only makes an individual doctor ineligible to own a pharmacy. We do not so construe the statute (§ 4080.5). Physicians may practice as a partnership and use an assumed name. Section 4081[5] of the Business and Professions Code permits the board of pharmacy to require an applicant, if a partnership, to disclose the occupation and professional qualifications of the partners to determine whether a partner is a person licensed to practice medicine. The ordinary partnership is an associa-

---

[4] Section 4080.5 of the Business and Professions Code reads as follows:
*"Issuance of permit to medical licensees prohibited*

"The Board shall not issue any new permit to conduct a pharmacy to a person who is licensed under Chapter 5 (commencing with Section 2000) of this division."

[5] Section 4081 of the Business and Professions Code reads as follows:
*"Pharmacy permits; application, issuance and renewal; nontransferability; effect*

"(a) Each application to conduct a pharmacy shall be made on a form furnished by the board, and shall state the name, address, usual occupation, and professional qualifications, if any, of the applicant. If the applicant is other than a natural person, the application shall state such information as to each person beneficially interested therein.

"(b) As used in this section, and subject to the provisions of subdivision (c) of this section, the term 'person beneficially interested' means and includes:

"(1) If the applicant is a partnership or other unincorporated association, each partner or member.

"(2) If the applicant is a corporation, each of its officers, directors and stockholders, provided that no natural person shall be deemed to be beneficially interested in a nonprofit corporation.

"(c) In any case where the application is a partnership or other unincorporated association, or is a corporation, and where the number of partners, members or stockholders, as the case may be, exceeds five, the application shall so state, and shall further state such information as to each of the five partners, members or stockholders who own the five largest interests in the applicant entity. Upon request by the executive secretary, the applicant shall furnish the board with such information as to partners, members or stockholders not named in the application, or shall refer the board to an appropriate source of such information.

"(d) Upon the approval of such application by the board and paying the fee required by this chapter for each pharmacy, the executive secretary of the board shall issue a permit to conduct a pharmacy under the provisions of Section 4080, if all of the provisions of this chapter have been complied with. Any other provision of law notwithstanding, such permit shall authorize the holder to conduct a pharmacy and to sell and dispense prophylactics, hypodermics, hypnotics, and poisons. The permit shall be renewed annually on or before November 1st of each year and shall not be transferable, and any change in the beneficial ownership interest of such pharmacy shall be reported within 30 days thereafter upon a form to be furnished by the board."

tion of two or more persons to carry on as co-owners of a business for profit. (*Brown* v. *Fairbanks*, 121 Cal.App.2d 432, 440 [263 P.2d 355].) The board of pharmacy issues permits to partnerships and does, of course, regulate or control for licensing purposes the business relationship as well as the individuals composing the partnership, but that is not to say that any such procedure makes the partnership any the less a form of co-ownership.

In some situations, for a limited and special purpose, a partnership may be considered as a separate entity from its partners as co-owners, but the facts in this case do not bring it into any of the possible exceptions. It is obvious that the statute would be completely frustrated if all that was necessary to circumvent the statute was for two doctors to form a partnership, and then operate a pharmacy where neither could, prior to the partnership, operate as such individually.

In *O'Kane* v. *Catuira*, 212 Cal.App.2d 131, 139-140 [27 Cal.Rptr. 818, 94 A.L.R.2d 487], it is pointed out that the ". . . Financial Code, sections 1800 and 1801, permit a 'partnership, corporation, or joint stock company or association' in the general travel and tourist business to apply for a license to transmit money to foreign countries. An individual engaged in the same business, however, is prohibited from doing so. We are of the opinion that this distinction is an arbitrary one, which bears no relation to the purpose of the legislation . . . [and] sections 1800 and 1801 are clearly invalid for the reasons above noted, . . ."

We hold that the statute applies to a partnership of doctors.

■ With reference as to whether the various sections of the law heretofore referred to are applicable to a situation where a doctor owns stock in a corporation which owns and conducts a pharmacy, we are persuaded that under the wording of the statutes in question there is no prohibition against an individual doctor or a medical partnership of doctors owning stock in a corporation which owns and conducts a pharmacy. As we view it, the Legislature took care not to prohibit doctors from organizing a corporation and securing a corporate pharmacy license.

"The stockholders of a corporation have no estate in the property of the corporation." (*Sanchez* v. *East Contra Costa Irr. Co.*, 205 Cal. 515, 518 [271 P. 1060].) "The stockholders of a corporation have no estate in the land or other property of the corporation, and the transfer by a stockholder of the

stock owned by him, does not transfer any of the property of the corporation, . . . in reference to the property held by it." (*Bank of Visalia* v. *Smith,* 146 Cal. 398, 403 [81 P. 542].) The Board argues that a shareholder is a part owner of the corporate property and cites *Richter* v. *Henningsan,* 110 Cal. 530. 534 [42 P. 1077], as authority. In *Richter* it is also said: "*A stockholder in a private corporation for profit is not in any proper sense the owner of the property of the corporation as such.* He has, however, a direct interest in the corporation." (Italics added.) It would seem that the Legislature prohibited physicians only from "membership, proprietary interest. or co-ownership in any form in or with a pharmacy . . ." The Legislature knew of *Richter* and when it prohibited "co-ownership in any form" it was not intended to prohibit the relation between a stockholder and the property owned by a corporation for "a stockholder . . . is not in any proper sense the owner of the property of the corporation as such."

The Board also cites *Borun Bros.* v. *Department of Alcoholic Beverage Control,* 215 Cal.App.2d 503 [30 Cal.Rptr. 175] as authority for the view that the Board of Medical Examiners may disregard the separate corporate existence of corporations owning pharmacies whose shareholders are doctors. A reading of the statute involved in *Borun* demonstrates how clearly the Legislature can express itself when it desires to prohibit or limit stock ownership, close corporations, common officers, and so forth. The statute in *Borun,* Business and Professions Code, section 25502, reads in part: "No manufacturer, wine grower, manufacturer's agent, . . . or wholesaler, or any *officer, director,* or agent of any such person, shall, except as authorized by this division, hold the ownership, directly or indirectly, of any off-sale general license for any premises, or own or control any interest, directly or indirectly, by *stock ownership, interlocking directors, trusteeship,* or mortgage of the premises or fixtures covered by an off-sale general license." (Italics added.)

The Board further contends that the statutes involved must be construed "*pari materia*" and argues, in effect, that section 4081 of the Business and Professions Code was adopted as a grant of power to the Board to police the provisions of section 4080.5 of the Business and Professions Code. A search of the legislative history of the bills in question indicates that Assembly Bill 332 was introduced on January

22, 1963, by Assemblymen Rumford and Gaffney to amend section 4081, Business and Professions Code, relating to pharmacies. The bill passed the Assembly April 8, 1963, and then went to the Senate. The Senate passed the bill, as there amended on April 25, 1963. On April 29, 1963, the Senate amendments were concurred in by the Assembly. The bill was signed by the Governor on May 14, 1963, and became chapter 395, 1963 statutes.

Assembly Bill 2509 was introduced April 18, 1963, by Assemblyman Holmes. The act was to amend section 654 and to add section 4080.5 to the Business and Professions Code. The bill passed the Assembly May 24, 1963, and passed in the Senate, as amended, on June 19, 1963. Not until June 5, 1963, was the language of section 4080.5 inserted in Assembly Bill 2509. The Assembly concurred in the amendments June 20, 1963. The Governor signed the bill on July 7, 1963. We cannot conclude that the Legislature intended section 4081 at the time of its introduction and passage to be an enforcement measure for a statute which at that time had not even been introduced in its final form.

This court, in order to adopt the interpretation called for by the Board, would have to add language to the statutes and assume, in effect, that the Legislature did not know what it was doing. This we are unwilling to do. (See *Caminetti* v. *Pacific Mutual Life Ins. Co.*, 22 Cal.2d 344, 353-354 [139 P.2d 908] ; *Santa Fe Transp. Co.* v. *State Board of Equalization*, 51 Cal.2d 531, 538-539 [334 P.2d 907] ; *Malone* v. *State Emp. Retirement System*, 151 Cal.App.2d 562, 567 [312 P.2d 296] ; *People* v. *Williams*, 222 Cal.App.2d 152 [34 Cal.Rptr. 806], Code Civ. Proc., § 1858.)

Furthermore, the statutes here involve penalties or forfeitures, and are penal in character ; consequently, under the circumstances we should construe the law strictly and in such a way as not to create a forfeiture unless such was clearly intended by the wording of the statutes. (See *Cantlay & Tanzola, Inc.* v. *Ingels*, 31 Cal.App.2d 553, 556-567 [88 P.2d 141] ; *Woods-Drury, Inc.* v. *Superior Court*, 18 Cal.App.2d 340, 344 [63 P.2d 1184] ; *Oddo* v. *Hedde*, 101 Cal.App.2d 375, 383 [225 P.2d 929] ; *DeMille* v. *American Federation of Radio Artists*, 31 Cal.2d 139, 156 [187 P.2d 769, 174 A.L.R. 382].)

In interpreting the statutes as we do, we are applying the general principles of the statutes only to the specific factual situations before us. In other words, we are only performing the task which the Legislature must have known would occur

when it adopted the guidelines or the words used in the respective statutes. Had the Legislature meant for the statutes to mean what the Attorney General asserts the Legislature intended, the Legislature could have and would have so stated. This it did not do.

In a companion case (as to one facet of the matter at hand), *Warrack Medical Center* v. *California State Board of Pharmacy, ante,* p. 118 [57 Cal.Rptr. 85] Judge Gittelson, as the trial judge, filed an extensive memorandum as to the law in the cause, stating in part:

"I. Except where expressly prohibited by law, such as in the practice of certain professions, including medicine (§ 2008 B. & P. Code), a corporation formed under the laws of the State of California has and may exercise and may be licensed and a permit issued to it for any lawful purpose. (Corp. C. § 300; California Constitution, Article 12, Sec. 1; *People* v. *Allied Architects Assn.* (1927) 201 Cal. 428 [257 P. 511].

"II. Whenever the California Legislature has intended to prohibit a particular class of persons from owning stock in a corporate licensee, or vest discretion in an administrative agency to deny to, or revoke a license of, a corporate licensee when any shares of its capital stock are owned or controlled by statutorily disqualified persons, it has expressly so provided. (B. & P. Code: §§ 6906, 7071, 7069, 7068.1, 7068, 7067, 6913.1, 6913, 6902.2, [*sic*] 6906, 7320, 7528, 7619, 7625, 8561, 8568, 9540.3, 9540.4, 9707, 19064, 10521, and 10564; Alcoholic Beverage Control Act; B. & P. Code §§ 25500(a), 25501(b), 25502, 25506, 24071, 23951, 23788.5, 23788 and 23722, Vehicle Code, Sec. 11703(b).)

"III. Section 4080.5, B. & P. Code, prohibits only the issuance of 'any new permit to conduct a pharmacy' 'to a person who is licensed under Chapter 5 (commencing with Section 2000) of this division.' It is specific. It prohibits the issuance of a Permit to only one express class of persons, to wit, one who is licensed under Chapter 5, the Medical Practice Act. (B. & P. Code § 2008.) The prohibition of the issuance of a license to the one expressed excluded class, does not prohibit the issuance of a license to any other classes. 'Expressio unius est exclusio alterius' (See cases collated, California Words, Phrases and Maxims, Volume 4, pp. 629-638).

"Section 4081(b), B. & P. Code is consistent therewith. It requires the Application to set forth: 'If the applicant is other than a natural person, the application shall state such

information as to each person beneficially interested herein . . . (2) If the applicant is a corporation, each of its officers, directors and stockholders.' ((b)(2).) 'In any case where the applicant is . . . a corporation, and where the number of . . . stockholders . . . exceeds five, the application shall so state, and shall further state such information as to each of the five . . . stockholders who own the five largest interests in the applicant entity.' ((c).) 'Upon the approval of such application by the board and paying the fee required by this Chapter for each pharmacy, the executive secretary of the board shall issue a permit to conduct a pharmacy under the provisions of Section 4080, if all of the provisions of this chapter have been complied with. ((d).) (See also §§ 4051, 4050, 4386, and Article II of said Division 2, Chapter 9, B. & P. Code, being §§ 4350 to 4361.) It does not disqualify any class of persons from being officers or directors or stockholders of a corporate applicant. It confers no discretion in the Board. The Board has not adopted, if it could legally do so, any rule or regulation purporting to disqualify any person licensed under the Medical Practice Act for being either an officer or director or stockholder of a corporate applicant for a Pharmacy License. It is questionable whether the Board could legally so do in the absence of a statutory disqualification.

"Respondent would have the Court construe Section 4080.5 so as to read: 'The board shall not issue any new permit to conduct a pharmacy to a person [when any other person "beneficially interested therein" includes a person] who is licensed under Chapter 5 (commencing with Section 2000) of this division.' This Court has no jurisdiction so to do. (CCP § 1858.) Section 4081 does not so do. Nor can this Court, as Respondent seems to contend, prescribe ethics for the medical profession. The Court is not vested either with jurisdiction or wisdom or expertise so to do. Under the Pharmacy Act (B. & P. Code §§ 4000 to 4416), the Board is given power to adopt rules 'of professional conduct appropriate to the establishment and maintenance of a high standard of integrity and dignity in the profession.' (§§ 4008.2, 4008.3.)

"It is a well established principle of law that the Court shall construe a Statute so as to be constitutional and not unconstitutional. § 4080.5 as construed by the Court raises no constitutional questions. If construed, as contended for by Respondent, serious constitutional questions would exist. The Legislature knew thereof. It had before it, at the time of considering and adopting the 1963 Amendment of §§ 4080.5

and 654 B. & P. Code, the Assembly Journal of May 21, 1963, Pages 3692-93, containing an Opinion of Legislative Counsel. (The Court is indebted to Counsel for Respondent for calling it to the attention of and providing the Court with a copy thereof.) Thereby, the attention of the Legislature was directed to the decisions of: *Louis K. Liggett Co.* v. *Baldridge* (1928) 278 U.S. 105 [73 L.Ed. 204, 49 S.Ct. 57] ; *Pratter* v. *Lascoff* (1933) 140 Misc. 211 [249 N.Y.Supp. 211], affd. 236 App. Div. 713 [258 N.Y.Supp. 1002], 261 N.Y. 509 [185 N.E. 716] ; *State* v. *People's Drug Stores* (1934) 36 Del. 120 [172 A. 257]) and particularly the portions in said Opinion quoted from *Liggett* : 'The court then stated : (at 73 L.Ed. p. 209) :

" ' "In the light of the various requirements of the Pennsylvania statutes, it is made clear, if it were otherwise doubtful, that mere stock ownership in a corporation, owning and operating a drug store, can have no real or substantial relation to the public health; and that the act in question creates an unreasonable and unnecessary restriction upon private business. . . . It is a matter of public notoriety that chain drug stores in great numbers, owned and operated by corporations, are to be found throughout the United States. They have been in operation for many years. We take judicial notice of the fact that the stock in these corporations is bought and sold upon the various stock exchanges of the country and, in the nature of things, must be held and owned to a large extent by persons who are not registered pharmacists. If detriment to the public health thereby has resulted or is threatened, some evidence of it ought to be forthcoming. None has been produced, and, so far as we are informed, either by the record or outside of it, none exists. *The claim, that mere ownership of a drug store by one not a pharmacist bears a reasonable relation to the public health, finally rests upon conjecture, unsupported by anything of substance.*'

"The question propounded to Legislative Counsel was: 'Can the Legislature prohibit a physician and surgeon from *owning* a pharmacy?' The conclusion was : 'Thus, in our opinion, the Legislature has the power to prohibit physicians and surgeons from *owning* pharmacies.' (italics ours)

"IV. Petitioner contends that the 1963 Amendment to § 654 B. & P. Code, 'Nor, after June 1, 1967, shall any person licensed under Chapter 5 of this division have any membership, proprietary interest, or co-ownership in any form in or with a pharmacy regulated by Chapter 9 (commencing with

Section 4000) of this Code, except that this shall not apply to a hospital pharmacy nor prohibit ownership in the building in which a pharmacy is located.' (Section 654 is a part of Article 6, 'Unearned Rebates, Refunds and Discounts'), prohibits the issuance of a License to Petitioner for the conducting of the said Hospital Pharmacy. The Court cannot agree therewith, for: Firstly: 654 expressly excepts therefrom a Hospital Pharmacy as sought by Petitioner ('except that this shall not apply to a hospital pharmacy'); Secondly: it would make effective September, 1963, what the Legislature has expressly provided shall only become effective 'after June 1, 1967'; Thirdly: assuming 654 shall become applicable and is constitutional, it only prohibits doctors from having 'any membership, proprietary interest, or co-ownership in any form in or with a pharmacy.' It does not prohibit doctors from being otherwise 'beneficially interested' therein (Section 4081). Under 4081 a person beneficially interested expressly includes a stockholder of a corporation. It follows, therefore, that the Legislature, in light of Legislative Counsel's Opinion and the cases therein set forth including *Liggett* and the portion hereinbefore quoted, only sought or intended to prohibit the 'owning' of a pharmacy by a person or intended to prohibit the 'owning' of a pharmacy by a person licensed under the Medical Practice Act. A stockholder of a corporation has no proprietary interest or co-ownership in any form in the property of the corporation.

"Sections 654 and 4080.5 are compatible in attempting to prohibit the issuance of a Pharmacy Permit to a person licensed under the Medical Practice Act, who is the or a owner of the pharmacy. Legislative Counsel was careful to restrict his Opinion to the question of a physician and surgeon *owning* a pharmacy. ('The proposal under consideration can be distinguished from the statute in the *Liggett* case. It would only prohibit physicians and surgeons from owning pharmacies. Anyone else could own such establishments. . . .') The Legislature might well conclude that it is in the best interest of the public to specifically prohibit a person who may write prescriptions for medicine from owning an establishment which fills such prescriptions. We note that the Legislature has prohibited a physician and surgeon from having any membership, proprietary interest or co-ownership in any form in or with a dispensing optician (Sec. 654, B. & P. C.).

"('Thus, in our opinion, the Legislature has the power to prohibit physicians and surgeons from owning pharmacies.')

"We must, of course presume that the Legislature was fully aware of all of its Statutes. 'The ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others. In this Code, the thing of which there may be ownership is called property.' (CC § 654; see also §§ 669, 678, 682, 681, 684, 818 and 829.)

"The foregoing is also compatible and consistent with § 4080.5, in that it only relates to 'any new permit to *conduct* a pharmacy.' (italics ours.)

"V. The decisions relied upon by Respondent do not support its contention:

" (i) In *Benson Packing Corp.* v. *O'Connell* (1961) 31 Misc.2d 1037 [220 N.Y.Supp.2d 1010], 'The New York City Charter expressly empowered the respondent to consider the character of an applicant for a license.' (P. 1011.) A corporation being a fiction of law, the only character that could be considered was that of the sole stockholder.

" (ii) In *Garford Laboratories, Inc.* v. *Department of Health of City of New York* (1945) 54 N.Y.Supp.2d 102, no law is cited or discussed.

" (iii) *Perpente* v. *Moss* (1943) 265 App.Div. 789 [40 N.Y. Supp.2d 895], was a proceeding to review a denial of a license for an employment agency. Petitioner had been president and apparently in control of Corporate Employment Services, Inc. at the time its license was revoked. (p. 896.) Under the New York law, 'the respondent would be prohibited from issuing a new license to the corporation for a period of three years.' Held: Respondent was within his rights in 'passing upon the character and fitness of the petitioner and to consider his connection with Corporate Employment Services, Inc., and also the wrongful acts of which the corporation was guilty while petitioner was connected with it in an important if not controlling position.' (p. 896.)

" (iv) In *Metropolitan Motors Corp.* v. *State of New Jersey, Division of Motor Vehicles* (1956) 39 N.J. Super. 208 [120 A.2d 776], an appeal to review the 'refusal of the Director of Motor Vehicles to grant the appellant a motor vehicle license,' the Statute provided, in part, 'The Commissioner may . . . license any proper person as such dealer.' Appellant being a corporation, a creation of law, the Director's conclusion that it did not qualify as a 'proper person,' being 'front' for a disqualified person, was supported thereby."

The judgment is affirmed in all respects.

Wood, P. J., and Lillie, J., concurred.